

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAR 14 2013

CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on March 14, 2013

for Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| In the Matter of the Personal Restraint Petition of | ) ) ) | No. 82101-1 |
| ROBERT LEE YATES, JR., | ) ) | En Banc |
| Petitioner. | ) ) ) ) | Filed MAR 14 2013 |

OWENS, J. -- This is Robert Yates's first personal restraint petition following our decision affirming his death sentence. Yates's petition includes 25 grounds for relief raising a host of legal issues, including jury summons and excusal procedures, ineffective assistance of counsel, juror bias, and public trial rights. None of Yates's claims of error clearly merit either oral review by this court or a reference hearing. Yates's personal restraint petition is therefore dismissed.

## STATEMENT OF FACTS

The details of Yates's crime are adequately set forth in our opinion in *State v. Yates*, 161 Wn.2d 714, 728-33, 168 P.3d 359 (2007), and need not be restated in full here. In brief, in 2000 Yates pleaded guilty in Spokane County Superior Court to 13

counts of aggravated first degree murder and one count of attempted first degree murder. *Id.* at 732. As a result, he was sentenced to 408 years in prison. *Id.* In 2002, Yates was convicted of two counts of aggravated first degree murder in Pierce County and was sentenced to death. *Id.* at 732-33. We affirmed Yates's Pierce County conviction and death sentence in 2007. *Id.* at 794. Yates filed this timely personal restraint petition in 2008. Additional facts will be developed as necessary to address specific issues raised by Yates.

## ISSUES PRESENTED[1]

1. Were Yates's constitutional rights violated by Pierce County's jury summons and excusal procedures and the rate of juror pay?

2. Does the process of death qualification violate the Washington Constitution?

3. Was Yates's right to a public trial violated?

4. Were Yates's constitutional rights violated based on juror misconduct?

5. Was Federal Bureau of Investigation Special Agent Mark Safarik's testimony admissible, and did trial and appellate counsel provide effective assistance on this issue?

6. Was Yates's right to effective assistance of counsel violated?

---

[1] Due to the number and length of the issues Yates presented in his grounds for relief, we have reorganized and condensed his claims where possible for greater accessibility. Each of Yates's claims is still addressed within this opinion.

7. Was the jury unconstitutionally prevented from giving meaningful effect to Yates's mitigation evidence by the questions presented to the jury required by the death penalty statute (often called "the statutory questions") or the prosecutor's argument, and did trial and appellate counsel provide effective assistance on this issue?

8. Did the State engage in improper argument regarding Yates's future dangerousness, and did Yates receive effective assistance of counsel on this issue?

9. Did this court properly conduct proportionality review on direct appeal, and is this court's method of proportionality review unconstitutional?

10. Is Washington's death penalty arbitrary in violation of the Eighth Amendment to the United States Constitution?

11. Does the cumulative error doctrine apply?

## ANALYSIS

I. Rules Governing Review of a Personal Restraint Petition in a Capital Case

A. Standard of Review

When considering a timely personal restraint petition, courts may grant relief to a petitioner only if the petitioner is under an unlawful restraint, as defined by RAP 16.4(c). RAP 16.4(a). Additionally, the availability of collateral relief is limited in two ways. *See In re Pers. Restraint of Davis*, 152 Wn.2d 647, 670-72, 101 P.3d 1 (2004) (*Davis* I). First, "[t]he petitioner in a personal restraint petition is prohibited

from renewing an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue." *Id.* at 671 (footnotes omitted). The interests of justice are served by reconsidering a ground for relief if there has been "an intervening change in the law 'or some other justification for having failed to raise a crucial point or argument in the prior application.'" *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 720, 16 P.3d 1 (2001) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388, 972 P.2d 1250 (1999) (*Gentry* II)). A petitioner may not avoid this requirement "merely by supporting a previous ground for relief with different factual allegations or with different legal arguments." *Davis* I, 152 Wn.2d at 671. Second, new issues must meet a heightened showing before a court will grant relief. For alleged constitutional errors, "[a] petitioner has the burden of showing actual prejudice . . .; for alleged nonconstitutional error, he must show a fundamental defect resulting in a complete miscarriage of justice." *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 251, 172 P.3d 335 (2007) (*Elmore* II). The petitioner must make these heightened showings by a preponderance of the evidence. *See Davis* I, 152 Wn.2d at 671-72.

B. Available Relief

We have three available options when reviewing a personal restraint petition: (1) dismiss the petition, (2) transfer the petition to a superior court for a full determination on the merits or a reference hearing, or (3) grant the petition. *In re*

*Pers. Restraint of Hews*, 99 Wn.2d 80, 88, 660 P.2d 263 (1983); *see* RAP 16.11(b), 16.12. Dismissal is necessary where a petitioner fails to make a prima facie showing of actual prejudice, for alleged constitutional errors; or, for alleged nonconstitutional errors, a fundamental defect resulting in a complete miscarriage of justice. *See In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813-14, 792 P.2d 506 (1990). Granting the petition is appropriate if the petitioner has proved actual prejudice or a fundamental defect resulting in a complete miscarriage of justice. *See In re Pers. Restraint of Pierce*, 173 Wn.2d 372, 377, 268 P.3d 907 (2011); *Hews*, 99 Wn.2d at 88. Finally, a hearing is appropriate where the petitioner makes the required prima facie showing "but the merits of the contentions cannot be determined solely on the record." *Hews*, 99 Wn.2d at 88; *see* RAP 16.11(b).

To establish a prima facie showing required for a reference hearing, a petitioner must offer "the facts underlying the claim of unlawful restraint and the evidence available to support the factual allegations." *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992) (*PRP of Rice*). Mere "[b]ald assertions and conclusory allegations" are insufficient to justify a reference hearing. *Id.* at 886. For "matters outside the existing record, the petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief"; if the "evidence is based on knowledge in the possession of others," the petitioner may either "present their affidavits" or present evidence to corroborate what the petitioner

5

believes they will reveal if subpoenaed.[2] *Id.* The corroboration must be more than mere speculation or conjecture. *Id.*

II.     Claimed Errors

A. Jury Summons and Excusal Procedures and Juror Pay (Claims 11-13)[3]

Yates contends that his constitutional rights were violated by Pierce County's juror summons, excusal, and pay procedures. Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant has a right to "a jury drawn from a fair cross section of the community." *Taylor v. Louisiana,* 419 U.S. 522, 527, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). The principle underlying this requirement is that the jury cannot serve its function "to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and . . . professional or perhaps overconditioned or biased response of a judge" if "distinctive groups are excluded from the pool." *Id.* at 530. At the same time, "[t]he fair-cross-section principle must have much leeway in application. The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." *Id.* at 537-38.

---

[2] Contrary to Yates's suggestion, this was not dicta in *PRP of Rice.* This court denied Rice's request for a reference hearing on his *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), claim based on the absence of admissible evidence to support it. *PRP of Rice,* 118 Wn.2d at 887-88.

[3] Next to each subheading, we list which of Yates's claims, as listed in his grounds for relief, that we are addressing.

A prima facie showing of violating the Sixth Amendment fair-cross-section requirement consists of three elements:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979). This is the challenger's burden. *State v. Cienfuegos*, 144 Wn.2d 222, 231-32, 25 P.3d 1011 (2001). If the challenger makes the prima facie showing, the State must demonstrate "a significant state interest." *Duren*, 439 U.S. at 367-68. That interest must be "manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.*

Yates makes three claims alleging violation of the fair-cross-section principle of the Sixth and Fourteenth Amendments. Yates fails to establish a prima facie showing as to any of those three claims. In addition, Yates asserts an Eighth Amendment violation based on the same facts underlying his fair-cross-section claims. The Eighth Amendment claims are discussed together after discussion of the three Sixth Amendment claims.

1. *Jury Summons Process* (Claim 11)

Yates first alleges a violation of his constitutional rights on the basis that the jury selection process failed to produce a venire drawn from a fair cross section of the community. Yates satisfies the first *Duren* requirement by identifying African-Americans and Latinos as two distinctive groups that were excluded from his venire. However, he fails to meet the second *Duren* requirement—demonstration that the representation of a "'distinctive' group in the community" was not "fair and reasonable in relation to the number of such persons in the community." *Id.* at 364. Yates provides no census statistics relating to ethnicity of either Pierce County residents or the venire members in his case. The sole evidence of underrepresentation Yates relies on comes from a declaration by Mary Kay High, Yates's defense attorney at trial. In her declaration, High states, "To the best of my recollection, African-Americans and Latinos were under-represented on Mr. Yates' venire. In addition, Asians may have also been under-represented." Pet'r's Reply Br. App. LL. High based her conclusion on her personal "familiar[ity] with the community and its ethnic diversity" that came from having "lived and worked in Pierce County for many years." *Id.*

High's declaration fails to establish a prima facie case of a fair-cross-section violation because mere "underrepresentation," in the sense that a group's representation is not at least equal to its proportion of the community, is not sufficient

to show that the representation is not "fair and reasonable," *Duren*, 439 U.S. at 364. For example, in *United States v. Orange*, 447 F.3d 792, 796 (10th Cir. 2006), a defendant presented evidence that in a given year, four groups were underrepresented in jury venires: African-Americans comprised 8.63 percent of the eligible population but only 5.06 percent of the venires, Native Americans comprised 4.27 percent of the eligible population but only 2.64 percent of venires, Asians comprised 1.64 percent of the eligible population but only .80 percent of venires, and Latinos comprised 2.74 percent of the eligible population but only 1.49 percent of the venires. The court held that this failed to establish the second *Duren* factor (i.e., that the representation of the groups was not fair and reasonable in relation to the population). *Id.* at 798-99. Although there is no single test to determine whether underrepresentation runs afoul of the fair and reasonable requirement, *Berghuis v. Smith*, 559 U.S. 314, 130 S. Ct. 1382, 1393-94, 176 L. Ed. 2d 249 (2010), *Orange* illustrates that a mere allegation of "underrepresentation" is insufficient to establish the second *Duren* factor. Consequently, the mere recollection of underrepresentation is insufficient to establish the second *Duren* requirement, and Yates's claim fails.

### 2. *Exclusion of Jurors by Court Personnel* (Claim 12)

Yates next argues that court personnel violated his Sixth Amendment fair-cross-section right by excusing prospective jurors. This argument suffers from the

same defect as above—it fails to establish that the venire did not contain a fair and reasonable representation of any distinctive group.

Yates asserts that the court personnel's exclusion of jurors without Yates's participation violated his due process rights. However, Yates provides no admissible evidence of Pierce County venire selection processes. Helpfully, the State provided documents on juror selection that are admissible under the "business records" hearsay exception, RCW 5.45.020. State's Corr. Resp. to Pers. Restraint Pet. App. B. These documents indicate that Pierce County creates a master source list using voter registration, driver's license, and Washington State identification card databases. *Id.* App. B(1). That method of creating a jury source list was upheld in *Cienfuegos*, 144 Wn.2d at 230-32. At the time of Yates's trial, jury clerks in Pierce County were authorized to excuse, without judicial oversight, persons who failed to meet the statutory requirements for jury service set forth in RCW 2.36.070, those completing two weeks of jury service within the past year, age-related requests, those with religious beliefs interfering with jury service, and those with permanent medical conditions interfering with jury service. State's Corr. Resp. to Pers. Restraint Pet. App. B(4). Jury clerks also had authority to grant deferrals based on a variety of factors, such as verified temporary medical conditions preventing service, sole care for dependent family members, and persons with appointments or obligations that could not be canceled without undue hardship. *Id.*

Yates argues that this scheme is somehow unlawful. In *State v. Rice*, 120 Wn.2d 549, 561, 844 P.2d 416 (1993), however, this court squarely held that judges may delegate to clerks the ability to excuse or defer persons summoned for jury service pursuant to RCW 2.36.100. That statute allows for excusal or deferral "upon a showing of undue hardship, extreme inconvenience, public necessity, or any reason deemed sufficient by the court." RCW 2.36.100(1). The policies at issue here were adopted by the Pierce County Superior Court Executive Committee and were, therefore, reasons "deemed sufficient by the court." Yates is therefore incorrect in asserting that the reasons go beyond the statutory excusal factors. As such, no statutory violation occurred in Yates's case that might give rise to a due process violation.

In sum, Yates's Sixth Amendment fair-cross-section claim fails because he cannot identify a distinct group that was excluded from the jury venire. Additionally, Yates fails to establish a due process claim based on a statutory violation.

### 3. *Juror Pay and Failure To Enforce Summonses* (Claim 13)

Yates's next fair-cross-section claim focuses on Pierce County's juror pay and failure to enforce jury summonses, which Yates suggests excludes working class and nonelderly persons. Yates asserts, based on a hearsay declaration, that Pierce County pays jurors $10 per day and does not pursue prosecution of persons who fail to respond to a jury summons. Even assuming the nonelderly and working class persons

11

Yates identifies are considered distinct groups under the first *Duren* requirement, Yates is unable to establish the second *Duren* element.

The second *Duren* element requires that Yates demonstrate "that the representation of [these] group[s] in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." *Duren*, 439 U.S. at 364. Though Yates includes the percentage of Pierce County residents that are between 18 and 65 years of age and the percentage that are over 65 years of age, he fails to establish the percentage of members of the venire within each of these categories. As to working class persons, Yates fails to show either their percentage of Pierce County residents or their representation in the venire. Yates's bare allegation of a discrepancy is insufficient, for "nowhere in our jurisprudence is it suggested a bare allegation that the jury list is not representative is sufficient to bring this issue into play." *Cienfuegos*, 144 Wn.2d at 232. Yates therefore fails to make a prima facie showing of a fair-cross-section violation.

We therefore dismiss Yates's claims that the Pierce County jury summons and exclusion procedures and jury pay violated his Sixth Amendment right to a venire that represents a fair cross section of the community.

### 4. Related Eighth Amendment Claims

For each of his three fair-cross-section claims, Yates also alleges a violation of the Eighth Amendment guaranty of a reliable sentencing determination in capital

12

cases. The United States Supreme Court has indeed stated that the Eighth Amendment requires greater reliability in capital cases than in noncapital cases. *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (lead opinion). The clear import of the Eighth Amendment reliability principle is that in capital cases, defendants are entitled to have juries make determinations about life and death after full consideration of the circumstances. *See id.* at 304; *Simmons v. South Carolina*, 512 U.S. 154, 172, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994) (Souter, J., concurring).

Yates appears to argue that any defect with respect to a jury summons procedure in a capital case necessarily renders the result unreliable and is structural error. Yates's briefing is not clear about the nature of the Eighth Amendment reliability-guaranty violation, but he seems to assert that it is established either (1) in the same manner as the Sixth Amendment fair-cross-section violation or (2) by some lesser showing than is required to demonstrate a Sixth Amendment fair-cross-section violation. The first assertion, that the Eighth Amendment reliability error is demonstrated in precisely the same manner as the Sixth Amendment fair-cross-section error, fails for the reasons discussed above. Insofar as Yates is arguing for a lesser showing, he is, in effect, contending that the same set of facts that are insufficient to make out a Sixth Amendment fair-cross-section claim *are* sufficient to make out an Eighth Amendment reliability claim in a capital case. Yates presents no applicable

13

precedent and does not set forth what he believes would be the appropriate test. Moreover, this would extend the Eighth Amendment reliability principle well beyond the purpose for which it was conceived and has been employed. The Sixth Amendment and Eighth Amendment guaranties complement one another in capital cases; there is no basis to conclude that the Eighth Amendment subsumes the Sixth Amendment's guaranties in capital cases.

Accordingly, we dismiss all of Yates's Eighth Amendment claims in Claims 11-13.

B. Death Qualification is a Violation of the Washington Constitution (Claim 16)

Yates begins this claim by asking us to overrule *State v. Brown*, 132 Wn.2d 529, 940 P.2d 546 (1997), and hold that the process of death qualification violates article I, sections 21 and 22 of the Washington Constitution. Death qualification, as explained in *Brown*, is the process by which prospective jurors whose "'views would prevent or substantially impair'" their ability to impose the death penalty may be challenged for cause in a capital case. *Id.* at 593 (internal quotation marks omitted) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)). The *Brown* court conducted a *Gunwall*[4] analysis and concluded that the Washington Constitution provided no broader protection in the context of death qualification than does the Sixth Amendment. *Id.* at 595-98.

---

[4] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

When a party urges us to overrule an earlier decision, that party must make "'a clear showing that [the] established rule is incorrect and harmful.'" *City of Federal Way v. Koenig*, 167 Wn.2d 341, 346-47, 217 P.3d 1172 (2009) (internal quotation marks omitted) (quoting *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 147, 94 P.3d 930 (2004)). Yates has not done so here.

Where Yates's argument clearly fails is the absence of any showing that the rule announced in *Brown* is harmful. To do so, Yates would have to show, at a minimum, that the process of death qualification results in juries that are not broadly representative of the community or are otherwise not impartial. *Cf. Taylor*, 419 U.S. at 530 (emphasizing the importance of a jury pool broadly representative of the community). While he makes conclusory statements to this effect and supports them with concurring and dissenting opinions by Justice Stevens, *see Baze v. Rees*, 553 U.S. 35, 84, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008) (Stevens, J., concurring); *Uttecht v. Brown*, 551 U.S. 1, 35, 127 S. Ct. 2218, 167 L. Ed. 1014 (2007) (Stevens, J., dissenting), and while that result is certainly conceivable, *but see Lockhart v. McCree*, 476 U.S. 162, 174, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986) ("[G]roups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors . . . are not 'distinctive groups' for fair-cross-section purposes."), Yates has not made the showing. Because the burden to demonstrate that the rule is harmful is Yates's, and

because he has failed to make that showing, we reject Yates's request to overturn *Brown*. As a result, his argument that the process of "death qualification" violates the state constitution fails under the authority of *Brown*.

In his reply brief, Yates makes several additional arguments that seem to be as-applied challenges to the process of death qualification. Specifically, he argues that jurors able to follow the law, but who give great weight to particular forms of mitigating circumstances, can be excused for cause. Yates's petition, however, clearly alleges only a facial challenge to the process of death qualification. Moreover, an as-applied challenge likely runs afoul of the relitigation bar because Yates unsuccessfully contested, in his direct appeal, the excusal for cause of three jurors, *Yates*, 161 Wn.2d at 742-46. *See Davis* I, 152 Wn.2d at 671 ("petitioner in a personal restraint petition is prohibited from renewing an issue that was raised and rejected on direct appeal" except under certain circumstances). Finally, Yates fails to support his as-applied challenge with cites to the record. Consequently, we dismiss Yates's claim that the "death qualification" process violates the Washington Constitution.

C. Violation of Public Trial Rights (Claim 14)

Under our state and federal constitutions, criminal defendants have a right to a public trial. *State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22 ("In criminal prosecutions the accused shall have the right to . . . a speedy public trial."). This right extends to jury selection.

16

*In re Pers. Restraint of Orange*, 152 Wn.2d 795, 804, 100 P.3d 291 (2004). Yates argues that his public trial rights were violated in two ways. First, Yates claims that the court closed the courtroom to the public during portions of voir dire. Second, Yates claims that keeping juror questionnaires confidential without a *Bone-Club*[5] hearing violated his right to a public trial. He has not demonstrated support for either claim.

### 1. Courtroom Closure

We must first determine whether the courtroom was actually closed. To prove a closure, Yates relies on two extra-record declarations: one from Barbara Corey and one from Karen Sanderson. Unfortunately, we cannot consider the Sanderson declaration because it contains inadmissible hearsay of statements made to Sanderson by one of the jurors. Am. Pers. Restraint Pet. & Supporting Br. App. Z. Such hearsay does not constitute "competent, admissible evidence" that is necessary to justify a reference hearing. *PRP of Rice*, 118 Wn.2d at 886.

Turning to the Corey declaration, we find that it fails to establish a prima facie showing of a closure. In her declaration, Corey makes three relevant statements:

> [1.] During selection and after individual voir dire, the court room was locked until the venire was seated. I do not recall when the courtroom was reopened.

> [2.] During individual voir dire, I do not recall members of the public being present in the courtroom.

---

[5] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

[3.] During the time that Mr. Yates' case was tried, it was not unusual in Pierce County Superior Court for the public to be excluded from the courtroom during voir dire on sensitive topics.

Am. Pers. Restraint Pet. & Supporting Br. App. Y at 1. The second and third of these statements clearly do not establish a closure. With respect to the second statement, evidence of absence is not evidence of exclusion. In other words, Corey never states that members of the public wanted to be present but were not allowed in. Similarly, the third statement establishes only that closures were not unusual, not that one occurred in Yates's case.

The first statement requires further analysis, but also ultimately fails. Corey states that "[d]uring selection and after individual voir dire, the court room was locked until the venire was seated." *Id.* Though artfully worded, this statement ultimately says very little. The statement refers to the seating of the venire, not the jury; therefore, it does not suggest that the public was excluded during the jury selection process. Instead, Corey's statement merely suggests, at most, that the door to the courtroom was locked each day until the members of the venire sat down. This is consistent with the declaration of Lettie Devish, Judge McCarthy's judicial assistant, in which Devish states:

> I left the courtroom locked until I gathered the venire panel from jury administration and lined them up in numerical order . . . . There was room for the venire and spectators in the courtroom, and both were present. . . . The courtroom was kept locked when the court was not in session, such as during the lunch break and at the close of the day.

State's Corr. Resp. to Pers. Restraint Pet. App. F at 2.

The relevant question, then, is whether locking the courtroom until the members of the venire have taken their seats is a closure of the courtroom. A commonly used test to determine if a closure occurred is the experience and logic test. *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012). Under that test, whether a closure occurs depends on (1) "'whether the place and process have historically been open to the press and general public'" and (2) "'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Id.* (quoting *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)). It is Yates's burden to satisfy the experience and logic test, which he fails to do. At no point does he argue that the venire lining up and taking their seats in any way "plays a significant positive role in the functioning of the particular process in question." *Press-Enter. Co.*, 478 U.S. at 8. Accordingly, Yates's claim fails because no closure occurred.

### 2. *Confidential Questionnaires*

Yates's second public trial contention concerns confidential juror questionnaires. The trial court, based on a stipulation by the parties, entered an order sealing the juror questionnaires on August 13, 2002. No *Bone-Club* analysis was conducted on the record. *See* 50 Verbatim Report of Proceedings (VRP) at 4333-4537. However, this court recently determined, in *State v. Beskurt*, ___ Wn.2d ___,

293 P.3d 1159 (2013), that the sealing of juror questionnaires without a *Bone-Club* hearing is not a violation of a defendant's public trial rights. The court concluded that no closure occurred because the questionnaires themselves had no independent effect on the trial; though the questionnaires served as a "framework" for oral voir dire, the oral portion of voir dire provided the basis for any for-cause challenges, and that portion of voir dire was open to the public. *Id.* at 1162. Since there was no closure, the defendant's article I, section 22 right to a public trial was not violated. *Id.* at 1162-63.

Under *Beskurt*, Yates has failed to make a prima facie showing that his right to a public trial was violated. Yates has failed to show that a closure occurred because he has not shown, or even attempted to show, that any for-cause challenge was based on the jury questionnaires, as opposed to oral voir dire, which was open to the public. Yates simply assumes that the sealing of juror questionnaires is a per se courtroom closure. Because Yates has failed to show that a closure occurred, he has failed to establish a violation of his right to a public trial.

D. Juror Bias Claim (Claim 15)

Yates argues that he was denied his constitutional right to a fair trial because one of the jurors in his case was biased. Yates claims that one of the jurors was biased because she stated, during trial, that she intended to write a book about the trial

after it was over. As support for this claim, Yates includes a declaration from juror

William Good, which states:

> During the trial, there was a woman on the jury who said that she was planning to write a book about the trial after it was over. . . . The woman was white and was younger than me. Based on the juror's statements and actions, I believed that she was re-creating her notes outside of court from events inside court so that she would have material for her book.

Pet'r's Reply Br. App. MM.

A defendant is guaranteed a fair trial before an impartial jury by the Sixth and

Fourteenth Amendments. *Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S. Ct. 2273, 101 L.

Ed. 2d 80 (1988). This right is violated by the inclusion on the jury of a biased juror,

whether the bias is actual or implied. *See Morgan v. Illinois*, 504 U.S. 719, 729, 112

S. Ct. 2222, 119 L. Ed. 2d 492 (1992) (inclusion of a single biased juror invalidates

death sentence); *Smith v. Phillips*, 455 U.S. 209, 221-24, 102 S. Ct. 940, 71 L. Ed. 2d

78 (1982) (O'Connor, J., concurring) (noting that implied bias may violate a

defendant's Sixth Amendment rights). A juror with a direct financial incentive is

deemed biased. *See United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000).

The State correctly argues that this claim is too speculative (i.e., Yates has not

established a prima facie case). Even accepting all of Good's statements as true and

giving them a liberal interpretation, Yates has provided no evidence whatsoever that

the other juror's intention to write a book biased her in any way. While it is entirely

conceivable that such an intention *could* result in bias, *see Dyer v. Calderon*, 151 F.3d

21

970, 982 n.19 (9th Cir. 1998) ("[A] juror who . . . secretly plans to write a memoir of the experience might then vote differently to provide drama, or he might inject personal prejudice into the jury room in an attempt to jazz up the deliberative process."), it is Yates's burden to demonstrate prima facie evidence of that bias, and he has failed to do so. As such, Yates is not entitled to a reference hearing and this claim is dismissed.

E. Safarik Testimony (Claims 2-6)

Yates contends that several statements by Safarik, made during his testimony about his linkage analysis, constituted "unscientific psychological testimony through an unqualified witness." Am. Pers. Restraint Pet. & Supporting Br. at 46. Yates argues that admission of that testimony was erroneous and in violation of the Eighth Amendment, that trial counsel was ineffective in failing to demand a *Frye*[6] hearing and failing to object, and that Yates's appellate counsel was ineffective in failing to raise the issue on direct review.

To begin, it is helpful to review the challenged statements in context. Safarik was called to testify about the "linkage assessment" he performed on the crimes committed in Spokane and Pierce counties. 65 VRP at 6846-50. According to Safarik, linkage assessment focuses on "three manifestations of behavior": "modus

---

[6] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

operandi," "ritualistic behavior," and "staging behavior." *Id.* at 6846. Safarik defined modus operandi (MO) as

> behavior that a[n] offender perceives as necessary for the successful completion of a crime. People who commit crimes, any types of crimes, want to be successful. They don't want to get caught. So what they try to do is they try to engage in behaviors that will make them successful in committing this crime.

*Id.* at 6859. Safarik testified this was important because "typically MO behaviors are goal driven. They're conscious behaviors engaged in by the offender to be a successful criminal." *Id.* at 6860. Turning to the second manifestation of behavior that looked to be a linkage analysis, Safarik explained that "ritualized behavior is that behavior which is unnecessary for the successful accomplishing of the crime." *Id.* at 6861. Ritualized behavior, according to Safarik, is "need-driven, it's emotionally psychologically driven, and so it shows up over and over again." *Id.* at 6863. Finally, Safarik defined staging behavior as "a conscious attempt by the offender to redirect the investigation away from what law enforcement would probably consider to be the most logical suspect." *Id.* at 6865.

In addition to the three focuses, Safarik testified that in performing a linkage analysis, he looks for a "precursing event," which is simply "something that happens in the offender's life" which "caused the offender to act out." *Id.* at 6868, 6870. This is relevant, Safarik explained, because "[t]ypically . . . in the signature violent crimes that we are working in our unit, homicides and serial sexual assaults, and this is

23

documented in the research literature as well, that there typically is a[n] event that occurs in the offender's life; we call it a precursing event." *Id.* at 6868-69. The defense objected to this testimony, and the trial court overruled the objection based on the State's assurance that "[t]his is not case specific and there will be no testimony about that in this case." *Id.* at 6869. Shortly thereafter, Safarik testified that he "didn't have materials in this case that would enable [him] to make that type of analysis or opinion." *Id.* at 6870.

In this personal restraint petition, Yates complains about four of Safarik's statements. First, Yates complains about Safarik's statement that "'[p]eople who commit crimes . . . want to be successful'" and "'don't want to get caught.'" Am. Pers. Restraint Pet. & Supporting Br. at 41 (quoting 65 VRP at 6859). Second, Yates complains about Safarik's additional statement that modus operandi behaviors are typically "'goal driven'" and "'conscious behaviors.'" *Id.* (quoting 65 VRP at 6860). Third, Yates now takes issue with Safarik's testimony that ritualized behavior is "'need-driven'" and "'emotionally psychologically driven.'" *Id.* (quoting 65 VRP at 6863). Fourth, Yates complains about Safarik's testimony that there is typically a precursing event in the types of violent crimes that Safarik's unit worked on. *Id.* at 42.

In reality, Yates's four claims assert that the linkage analysis was unreliable and therefore inadmissible. Though Yates purports to challenge only four specific

statements and the prejudice they caused at sentencing, those statements were part and parcel of the linkage assessment—the statements defined the terms at the core of the linkage assessment. If, in fact, they were inadmissible, the linkage assessment itself would have been inadmissible. To the extent Yates claims the statements went beyond the linkage assessment and commented on his psychology, he simply misreads the testimony. Safarik testified that he was not a psychologist and that he was "not making any diagnosis about any individual's personality or mental illness or personality disorder." 65 VRP at 6847. In context, the challenged statements were clearly about offenders in general and not about Yates in particular.

First, we note that Yates's linkage assessment claims are not subject to the relitigation bar. "A claim rejected on its merits on direct appeal will not be reconsidered in a subsequent personal restraint petition unless the petitioner shows that the ends of justice would be served thereby." *In re Pers. Restraint of Jeffries*, 114 Wn.2d 485, 487, 789 P.2d 731 (1990). Merely "supporting a previous ground for relief with different factual allegations or with different legal arguments" is insufficient to constitute a new issue. *Davis* I, 152 Wn.2d at 671. On direct appeal, Yates challenged the admission of Safarik's testimony on three bases: (1) Yates had not placed his identity at issue, (2) the testimony created an improper opinion as to guilt, and (3) the testimony constituted improper propensity evidence. *Yates*, 161 Wn.2d at 762-63; Br. of Appellant, *State v. Yates*, No. 73155-1, at 137-46. We

rejected Yates's challenges to Safarik's testimony. *Yates*, 161 Wn.2d at 763. In this personal restraint petition, Yates makes a new claim—that the linkage analysis was unreliable.

While seemingly similar to the claims he raised on direct appeal, Yates's new claims against Safarik's testimony are qualitatively different from those presented on direct review. Though the result of success on his legal arguments on direct appeal would have been identical to the result of success on the issue raised on collateral attack, reliability of testimony is an issue discrete from an argument that the same testimony is irrelevant as not at issue, constitutes an improper opinion, or is impermissible propensity evidence. The State glosses over this distinction by stating that "this Court found that Safarik's testimony was *properly* admitted on direct review and that there was no error." State's Corr. Resp. to Pers. Restraint Pet. at 93. This is imprecise. On direct review, we held that Safarik's testimony was not *improperly* admitted for reasons alleged by Yates. *Yates*, 161 Wn.2d at 762-63. We could not, nor did we purport to, go further—put differently, we did not decide issues not before us. Had Yates challenged the reliability of the linkage analysis on direct appeal, the relitigation bar would apply here, but he did not.

In evaluating Yates's claim, we cannot help but focus on his failure to make the required showing of prejudice. Yates alleges Sixth and Eighth Amendment violations from admission of the testimony. Accordingly, Yates must prove that the violation

resulted in actual prejudice. *See Elmore* II, 162 Wn.2d at 251. According to Yates, the prejudice resulted from Safarik testifying "that Yates's state of mind was especially egregious—perhaps even more egregious than other serial killers." Am. Pers. Restraint Pet. & Supporting Br. at 46. This statement simply misrepresents Safarik's testimony. In context, the challenged comments plainly referred to criminal behaviors generally, not to Yates in particular. In no way did Safarik suggest that Yates was more culpable than other serial killers—Safarik merely stated that he lacked materials to determine whether one common trait of serial killers was present. *See* 65 VRP at 6870. As a result, Yates has failed to show actual prejudice from the admission of Safarik's testimony. Similarly, Yates cannot establish that his appellate counsel was ineffective for failing to raise this issue, as any error would necessarily have been deemed harmless for the same reason that there is no prejudice here. *See In re Pers. Restraint of Dalluge*, 152 Wn.2d 772, 788, 100 P.3d 279 (2004) (setting forth the rule that prejudice exists when a defendant shows that there is a reasonable probability that, but for counsel's errors, the proceeding would have resulted differently). The absence of prejudice is fatal to each of Yates's claims stemming from Safarik's testimony, and we dismiss each of his challenges.

F. Ineffective Assistance of Counsel (Claims 1, 10, 17)[7]

Ineffective assistance of counsel claims are governed by the analytical framework established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The convicted defendant must show that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "the deficient performance prejudiced the defense." *Id.* at 687-88.

To establish deficient performance, the defendant must overcome "a strong presumption that counsel's conduct" was reasonable. *Id.* at 689. Conduct is evaluated by its reasonableness at the time it was undertaken. *Id.* To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome"; the "defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case." *Id.* at 693-94. This assessment is made by weighing "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [collateral] proceeding . . . against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. 362, 397-98, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

---

[7] Yates's other ineffective assistance of counsel claims are closely related to other claims and are discussed in the context of those related claims.

*1. Penalty Phase* (Claim 1)

Yates first argues that he received ineffective assistance of counsel in the penalty phase of trial. He alleges that his counsel failed to (a) investigate the possible presence of a mental disease or defect or neuropsychological deficit, (b) investigate mitigation testimony by family members of Yates's Spokane victims, (c) investigate information humanizing Yates, (d) investigate evidence of Yates's future dangerousness in prison, and (e) present evidence of Yates's cooperation with and decision to plead guilty to the Spokane murders.

The United States Supreme Court has repeatedly addressed defense counsel's duty to investigate potential mitigating evidence in capital cases. *See, e.g., Bobby v. Van Hook*, 558 U.S. 4, 130 S. Ct. 13, 175 L. Ed. 2d 255 (2009) (per curiam); *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005); *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). An inadequate investigation of mitigating evidence may cause counsel's performance to fall below an objective standard of reasonableness. *Williams*, 529 U.S. at 395-96. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. Rather, the inquiry focuses on whether "'reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). This requires the court to "conduct an objective review of [counsel's]

performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Id.* at 523 (quoting *Strickland*, 466 U.S. at 688-89). This includes consideration of "whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. In addressing the prejudice caused by the failure to conduct a competent investigation, the fact that counsel employed a reasonable mitigation theory is irrelevant. *Sears v. Upton*, __ U.S. __, 130 S. Ct. 3259, 3265, 177 L. Ed. 2d 1025 (2010) (per curiam).

a. Failure To Investigate Neuropsychological Impairments

Yates has not made a prima facie showing that counsel's failure to investigate mental and neuropsychological deficits constituted ineffective assistance. Yates suggests that trial counsel's investigation was unreasonable because (1) trial counsel did not request testing by the neuropsychologist to evaluate neuropsychological deficits in the temporal lobe and (2) trial counsel did not investigate whether Yates suffered from a sexual disorder that contributed to the murders. Yates's trial counsel *did* conduct an inquiry into Yates's mental health. Trial counsel retained a neuropsychologist, Dr. Rich Kolbell, who tested Yates and produced a report consisting of 87 pages of materials. That report is not included in the record but was relied on by experts retained by Yates in this personal restraint petition. It also appears that trial counsel retained a psychiatrist, Dr. Dorothy Lewis, who conducted

an evaluation of Yates and prepared a draft report. This report also does not appear in the record on review.

In his attempt to show deficient performance, Yates relies on a declaration from trial counsel. At most, that declaration shows that trial counsel failed to direct which tests the neuropsychologist performed. This is evident from two statements. First, trial counsel states that

> we did not retain an expert to opine whether Mr. Yates suffers from a sexual deviancy disorder. Further, because we did not retain an expert to evaluate and form an opinion about whether Mr. Yates' [*sic*] suffers from a sexual disorder, no expert evaluated whether there was any connection between any sexual disease or disorder and the multiple homicides.

Am. Pers. Restraint Pet. & Supporting Br. Ex. A at 3. This statement does not explain the purpose for which Dr. Lewis was retained.

Second, trial counsel states:

> I recognized that neuropsychological dysfunction often plays a role in homicides and can be a powerful mitigating factor. . . . For that reason we retained a neuropsychologist who tested Mr. Yates. I did not direct that expert regarding which tests to perform. More specifically, I did not request that he administer tests designed to evaluate whether Mr. Yates suffers from neuropsychological deficits in the temporal lobe region of the brain. . . . There was no tactical reason for our team not to conduct a neuropsychological evaluation focusing on temporal lobe dysfunction.

*Id.* In this statement, trial counsel acknowledges that he *did* conduct an investigation into neuropsychological dysfunction. All trial counsel now acknowledges is a failure to have directed the expert as to which neuropsychological tests to employ.

On collateral review, Yates has included three new mental health evaluations. Dr. Fred Berlin, based in part on the earlier report by Dr. Kolbell, concluded that Yates was not "fully capable of completely and permanently stopping his actions on his own," but acknowledged that "there would likely have been disagreements" about the extent to which Yates's volitional control was compromised. *Id.* Ex. C at 4-6. Dr. Dale Watson, a clinical and forensic psychologist, performed a battery of tests on Yates and determined that "there were indications of mild neuropsychological dysfunction" and "striking implications of subcortical dysfunction." *Id.* Ex. E at 9. Dr. Ruben Gur conducted neuroimaging studies of Yates's brain, including magnetic resonance imaging and positron emission tomography. These tests indicated multiple abnormalities in regions of Yates's brain "that are very important for regulating behavior." Pet'r's Reply Br. Ex. KK at 4.

Notwithstanding the new evaluations, Yates cannot show deficient performance by trial counsel. In light of the investigation conducted by trial counsel, including retention of appropriate experts, Yates cannot overcome the "strong presumption" of effective representation. *Strickland*, 466 U.S. at 689.

While interesting, and while presentation of this information to the jury might have resulted in a different outcome, Yates has not shown that based on the information available to trial counsel, failure to further investigate neuropsychological deficits was unreasonable. This is not a case in which trial counsel failed to

investigate a category of mitigating evidence, *see Wiggins*, 539 U.S. at 523-24; *Williams*, 529 U.S. at 395-96, or failed to take even basic steps to investigate, *see Rompilla*, 545 U.S. at 382-84 (trial counsel failed to examine defendant's court file or prior conviction despite knowing prior convictions were a basis relied on by state to impose the death penalty). Nor was the expert appointed too late to provide meaningful benefit to the case. *See In re Pers. Restraint of Brett*, 142 Wn.2d 868, 878, 16 P.3d 601 (2001).

Trial counsel's duty is to retain qualified experts and provide those experts with relevant information; once appropriate experts are retained, determining what specific tests to perform may be properly left to those experts. *Davis* I, 152 Wn.2d at 733 ("It was clearly within the "'wide range of professionally competent assistance'" for defense counsel 'to rely on properly selected experts.'" (quoting *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) (quoting *Strickland*, 466 U.S. at 690))). Yates's implication that trial counsel should have specifically directed the retained neuropsychologist to look for "deficiencies in temporal lobe functioning," Am. Pers. Restraint Pet. & Supporting Br. at 30, is unavailing. Similarly, failure to retain an expert for the specific purpose of opining on whether Yates possessed a sexual disorder, such a necrophilia, does not render counsel's performance deficient where

an expert who is retained possesses the ability to make such a diagnosis.[8] Failure to micromanage the testing performed by experts is different in kind from failing to provide those experts with information needed to conduct their evaluations, which would constitute deficient performance. *Cf. Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999) (noting counsel's "professional responsibility to investigate and bring to the attention of mental health experts . . . facts that the experts do not request").

Trial counsel's declaration does not suggest a different conclusion. The declaration does not preclude the inference that, though not hired for the *purpose* of opining whether Yates suffered from a sexual deviancy disorder, Dr. Lewis was capable of diagnosing Yates with a sexual deviancy disorder and, in fact, may have done so. Indeed, such a diagnosis would at least be suggested by the fact that Yates committed multiple acts of necrophilia. These acts were known to Yates's counsel, and there is no allegation that counsel failed to disclose these acts to Dr. Lewis. Tellingly, trial counsel does not state either (1) that he failed to investigate the presence of the sexual deviancy disorder or (2) that any failure lacked a tactical justification.

Yates has not made a prima facie showing of ineffective assistance of counsel. Trial counsel retained both a neuropsychologist and a psychiatrist prior to the

---

[8] The benefit of diagnosing Yates with a sexual disorder is apparently that it would have led to evidence of a neuropsychological disorder indicating a lack of volitional control. *See* Am. Pers. Restraint Pet. & Supporting Br. Ex. C at 6-7.

mitigation phase of trial. Both experts prepared reports for defense counsel. Yates has not shown that trial counsel either failed to provide experts with relevant information or imposed any limitations on the scope of the experts' evaluations, much less that those limitations were unreasonable. *See Davis* I, 152 Wn.2d at 724-26, 731-33 (finding effective assistance where counsel imposed limitations on the work of experts). Accordingly, Yates has not made a prima facie showing of deficient performance based on failure to investigate neuropsychological deficits or the presence of sexual deviancy disorders. His ineffective assistance of counsel claim necessarily fails.

b. Testimony by Victims' Family Members

In contrast, Yates has made a prima facie showing that his trial counsel's performance was deficient based on counsel's failure to investigate the possibility of having victims' relatives testify against imposing the death penalty. "Prevailing norms of practice as reflected in American Bar Association [(ABA)] standards and the like . . . are guides to determining what is reasonable, but they are only guides." *Strickland,* 466 U.S. at 688 (internal citations omitted). The relevant ABA guidelines are those in effect at the time of trial. *Bobby,* 558 U.S. at 7. Under the ABA guidelines in effect in 2002, at the time of Yates's trial, the guidelines stated that "[c]ounsel should consider interviewing potential witnesses, including . . . members of the victim's family opposed to having the client killed." ABA, GUIDELINES FOR THE

APPOINTMENT & PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES, Guideline 11.4.1(D)(3)(C), at 94-95 (1989). And yet trial counsel acknowledges:

> I did not investigate, nor cause an investigation to be conducted into whether any of the survivors of the victims of the Spokane County murders would be willing to testify in Pierce County that the information regarding the homicides provided by Mr. Yates, or his acceptance of responsibility through his guilty pleas, provided some degree of closure and/or measure of comfort for the victims' survivors.

Am. Pers. Restraint Pet. & Supporting Br. Ex. A at 4.

Focusing on counsel's perspective at the time of trial, counsel knew that the State intended to use the 13 murders to which Yates had pleaded guilty as an aggravating circumstance, as it had alleged that the two Pierce County murders were "part of a common scheme or plan." RCW 10.95.020(10). Counsel was thus undoubtedly aware that these murders posed an additional obstacle to demonstrating "sufficient mitigating circumstances to merit leniency." RCW 10.95.030(2). The possible measure of comfort and relief that pleading guilty would provide to surviving relatives of the victims would, while perhaps not sufficient standing alone, provide one source of mitigating evidence. And yet counsel did not even explore the possibility that among the many surviving family members of Yates's victims at least some would be willing to testify on his behalf. Trial counsel "ignored pertinent avenues for investigation of which he should have been aware." *Porter v. McCollum*,

558 U.S. 30, 40, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009). This failure to investigate is deficient performance.[9]

Nevertheless, Yates cannot establish prejudice from this failure to investigate. Yates has provided a declaration of one victim's mother who stated that his decision to plead guilty "provided [her] with some solace" and that she would have so testified at trial. Am. Pers. Restraint Pet. & Supporting Br. Ex. F at 1. However, this is not a case where the jury "heard almost nothing that would humanize [Yates] or allow [it] to accurately gauge his moral culpability." *Porter*, 558 U.S. at 41; *see infra* pp. 38-39 (discussing humanizing evidence presented). Instead, this additional evidence is the sort that "would barely have altered the sentencing profile presented to the" jury. *Strickland*, 466 U.S. at 700. Weighing against this merely marginally beneficial additional evidence is the enormity of Yates's crimes—the murders of 15 human beings. In addition, had the evidence been fully investigated and presented at trial, it would have opened the door to damaging rebuttal testimony from relatives of Spokane victims who were not comforted by his decision to plead guilty in exchange for a sentence of life imprisonment without the possibility of parole. *See* State's Corr. Resp. to Pers. Restraint Pet. App. H, Q.

---

[9] This is to be distinguished, of course, from a reasonable strategic decision not to present testimony from such victims. There may, as the State asserts in its briefing, have been good reason to forgo such testimony. However, the relevant question is whether the investigation supporting that decision "*was itself reasonable.*" *Wiggins*, 539 U.S. at 523.

c. Presentation of Evidence of Cooperation with Spokane Police

Yates alleges—with minimal discussion—that trial counsel was deficient in failing to present evidence that he confessed, pleaded guilty in Spokane County, and cooperated with law enforcement. In fact, this evidence was before the jury. *See* 54 VRP at 5216-17 (admitting, in guilt phase, Spokane County statement on plea of guilty). What Yates appears to be complaining about is that his attorney failed to highlight this evidence to the jury as a theme. Yates cannot overcome the "strong presumption" of nondeficient performance, particularly in light of the fact that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 689-90.

Yates makes no argument that trial counsel's failure to emphasize such evidence was not the product of strategic thinking. Trial counsel's declaration does not discuss the presence or absence of strategic thinking with respect to this decision. Counsel's decision not to focus on this evidence could have served several valid strategies. First, counsel might have sought to avoid emphasizing the additional murders Yates had committed. Second, counsel might have believed such an argument was unavailing—and therefore a waste of time—in light of the prosecution's juxtaposition of Yates's failure to take responsibility for, and reveal the locations of the remains of, his Pierce County victims, Mercer and Ellis. While these

strategies ultimately proved unsuccessful, courts must make "every effort . . . to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

### d. Humanizing Evidence

Yates next contends that trial counsel's failure to "develop[] and present[]" additional evidence to humanize him rendered counsel's performance ineffective. Am. Pers. Restraint Pet. & Supporting Br. at 36. As a starting point, trial counsel presented numerous witnesses tending to humanize Yates, including family members, high school sports coaches, fellow members of the military who had served with Yates, and clergy and prisoners who had had religious discussions with Yates. Further, Yates delivered an allocution to the jury. The additional evidence collateral counsel contends should have been presented includes Yates's daughters, son, stepmother, half sisters, brother-in-law, aunt, uncle, cousins, aunt's sister, and school classmate.

Trial counsel was "obviously interested" in presenting testimony of family members, but, after investigating that avenue, discovered that "[m]ost of Mr. Yates' family members were understandably conflicted." *Id.* Ex. A at 4. As a result, trial counsel decided not to call additional family members during the penalty phase. *Id.* Presenting testimony by conflicted family members, subject to cross-examination, might have prompted the prosecutor to argue that Yates had also victimized his own family through his actions. Counsel's strategic decision is not objectively

unreasonable. *See Stenson*, 142 Wn.2d at 741-47 (holding that failure to present evidence rebutting lack of remorse was not deficient where counsel made a substantial attempt to humanize defendant).

#### e. Future Dangerousness Investigation

Yates argues that trial counsel's investigation of Yates's future dangerousness was deficient and prejudicial. Trial counsel investigated this issue and, indeed, presented testimony during the penalty phase from eight corrections officers and a records custodian concerning Yates's good behavior in jail. Counsel also presented testimony from the manager of the intensive management unit of the Washington State Penitentiary concerning the infrequency of escapes and assaults. Yates contends it was deficient performance for trial counsel to not additionally hire an expert to assess Yates's future dangerousness. Yates relies on two pieces of evidence: (1) trial counsel's declaration that his failure to retain an expert was not the product of a tactical decision but, rather, the result of his failure to "consider it," Am. Pers. Restraint Pet. & Supporting Br. Ex. A at 4.; and (2) a report by Dr. Ronald Roesch that Yates "presented . . . a low risk for violence in prison," *id*. Ex. U at 1.

Trial counsel's performance did not fall below an objective standard of reasonableness. This was not a case where counsel "ignored pertinent avenues for investigation," *Porter*, 558 U.S. at 40. Counsel conducted a sufficiently "thorough investigation of law and facts." *Strickland*, 466 U.S. at 690. Though counsel's failure

to retain an expert on future dangerousness was not a conscious decision (i.e., not the product of strategic thinking) and "*post hoc* rationalization[s]" are inadequate to justify the absence of a strategic decision, *Wiggins*, 539 U.S. at 526-27, this only demonstrates deficiency of an investigation if it is not reasonably complete. For example, in *Wiggins*, trial counsel conducted a minimal preliminary investigation into a capital defendant's life history, obtaining a one-page account of his personal history from the presentence investigation report prepared by the Maryland Division of Parole and Probation and records relating to the defendant's placements in the foster care system. *Id.* at 518, 523. The Court held that failure to acquire more than this "rudimentary knowledge" of the defendant's history was deficient performance, particularly in light of the fact that these records contained leads toward potentially fruitful sources of additional facts. *Id.* at 524-25. Here, by contrast, there were not additional facts to be adduced by further investigation, merely an expert's bolstering of inferences that could already be drawn from the extensive evidence already discovered.

Moreover, even if trial counsel's failure to retain an expert to further investigate Yates's future dangerousness was deficient performance, it was not prejudicial. The additional mitigating evidence counsel failed to discover was largely duplicative of evidence before the jury. Reweighing "the evidence in aggravation against the totality of available mitigating evidence," *id.* at 534, there is simply no

41

reasonable probability that the jury would have returned a different verdict. This is particularly true because, as the State points out, introduction of the study would likely allow for damaging rebuttal evidence.

### 2. *Guilty Plea in Spokane County* (Claim 10)

Yates next alleges that his Pierce County trial counsel was ineffective in advising him to plead guilty to 13 murders in Spokane County prior to his Pierce County trial. The prejudice Yates identifies is that the Pierce County jury considered the Spokane County murders in deciding whether to impose the death penalty. However, Yates cannot show that counsel's performance was prejudicial, even assuming it was deficient. Accordingly, we dismiss this claim.

Yates was arrested in Spokane County on April 18, 2000. Richard Fasy was assigned as lead counsel for Yates in Spokane County. In July 2000, the State and Yates began negotiating a plea agreement under which Yates would plead guilty and reveal the location of the body of an additional victim in exchange for a sentence of life without the possibility of parole. Yates has stated that he intended "to admit responsibility for all of my crimes and to accept a sentence of life in prison without the possibility of parole." Am. Pers. Restraint Pet. & Supporting Br. Ex. W at 1. Initially, the Spokane County prosecutor and Yates believed that this would apply to all of Yates's murders, including those that occurred in Pierce, Skagit, and Walla Walla Counties. In mid-July, Pierce County notified Spokane County that it was

filing an information charging Yates with two counts of aggravated first degree murder. Roger Hunko was appointed to represent Yates in Pierce County at that time. The Spokane County plea bargain remained on the table. Ultimately, Yates went through with the plea bargain in Spokane County. Hunko advised Yates to plead guilty in Spokane County, but the evidence is conflicted as to whether Hunko merely "agreed with Mr. Yates and his Spokane attorneys," *id.* Ex. A at 2, Ex. W, or the Spokane County attorney "deferred to Mr. Hunko's judgment," *id.* Ex. V at 2. In any event, Hunko "did not consider the possibility of seeking a continuance or stay of the consolidated Spokane County cases, so that the Pierce County cases would be tried first." *Id.* Ex. A at 2.

In essence, Yates was left with two options that would serve his stated goals: (1) plead guilty in Spokane County and then face trial in Pierce County or (2) delay pleading guilty in Spokane County until the Pierce County trial was concluded. Both options entailed risks. The risks of the first option—the one Yates pursued—are quite apparent. By pleading guilty to 13 counts of murder in Spokane County before facing trial in Pierce County, Yates made it easier for the State to demonstrate the existence of a common scheme or plan, and the evidence of his Spokane County murders was admissible during the penalty phase. This risk was mitigated, to some degree, by the possibility of arguing in Pierce County that equitable estoppel precluded the State from seeking the death penalty, *see* 14 VRP at 627-788 (holding an evidentiary

hearing on the applicability of equitable estoppel). The first option also provided a key benefit—it removed the possibility of the death penalty for 13 of Yates's murders. The second option also presented certain risks. The chief risk of the second option was that Spokane County might change its mind and seek the death penalty for the 13 cases it continued to handle. *See State v. Wheeler*, 95 Wn.2d 799, 805, 631 P.2d 376 (1981) ("[A]bsent a guilty plea or some other detrimental reliance by the defendant, the prosecutor may revoke any plea *proposal*."). This would have been especially concerning had Yates been convicted in Pierce County, regardless of whether the death penalty was imposed, because Spokane County would have had an easier time proving the existence of a common scheme or plan.

Even assuming arguendo that Hunko's performance was deficient, Yates cannot establish prejudice. Had Hunko investigated all plausible options, he would have been faced with the strategic decision discussed above. Yates has provided no evidence that Hunko would have advised Yates differently. In addition, Yates has provided no evidence that Spokane County would have agreed to any proposed delay or that a court would have granted the delay over the County's objection. As a consequence, he has not demonstrated "a reasonable probability" that absent the deficient performance the result would have been different. *Strickland*, 466 U.S. at 694.

*3. Life Qualification* (Claim 17)

Yates contends that trial counsel provided ineffective assistance during voir dire because counsel failed to employ the "Colorado method." Pet'r's Reply Br. at 55. Yates claims that there is a reasonable probability that this deficiency resulted in a jury that excluded qualified jurors and/or included jurors who would automatically vote for death upon a finding of guilt or would be unable to consider mitigating evidence. In support of his claims, Yates has included an affidavit from Matthew Rubenstein, the former director of the Oregon Capital Resource Center.

The Colorado method is one approach to selecting a capital jury. According to Rubenstein:

> The "Colorado Method" of capital jury selection requires the defense team to utilize the juror questionnaire and voir dire to identify the prospective juror's views about the death penalty, question the juror in a manner to establish a record to create a legal basis with which to advance cause challenges to state-favored pro-death jurors and to defend state cause challenges to defense-favored pro-life jurors, and then question the juror in a manner to determine and confirm the juror's capacity and commitment to making the penalty phase sentencing determinations in a constitutionally legitimate and appropriate manner.

Am. Pers. Restraint Pet. & Supporting Br. Ex. AA at 3. Yates further explains, in his reply brief, that under the Colorado method, "[a] juror's attitudes about the death penalty are the *only* criteria for selection." Pet'r's Reply Br. at 60.

Yates's argument of deficient performance lacks merit. Yates relies on Rubenstein's declaration in claiming deficient performance. Rubenstein reviewed the

voir dire transcript and juror questionnaires and concluded that trial counsel "in many instances failed to effectively utilize the strategy, methods, and techniques of Colorado-method life-qualification jury selection." Am. Pers. Restraint Pet. & Supporting Br. Ex. AA at 4. Rubenstein, however, fails to identify any specific prospective jurors of whom additional questions should have been asked. Moreover, Yates's presumption that the Colorado method is the only approach to jury selection that is constitutionally adequate lacks any support. Indeed, it goes against the Supreme Court's holding in *Strickland*:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

466 U.S. at 688-89.

Furthermore, the record establishes that trial counsel conducted an at least adequate voir dire. For example, for almost every juror ultimately challenged for cause by the State, defense counsel elicited answers calculated to counter the State's request. *E.g.*, 33 VRP at 2078-81 (juror 26); 34 VRP at 2281-83 (juror 39); 35 VRP at 2413-15 (juror 52), 2427-30 (juror 14). Additionally, counsel actively sought to expose bias on the part of prospective jurors that appeared to favor the State. *E.g.*, 32 VRP at 1865-66, 1876-77 (juror 9); 34 VRP at 2111-12, 2116, 2118-19, 2122 (juror 29), 2161-63 (juror 33). Defense counsel also questioned jurors on their willingness

to respect the views of others and ability to insist on respect for their own views. *See, e.g.,* 38 VRP at 2841 (juror 89). Counsel was successful in having 15 jurors excused for cause. In light of counsel's rigorous testing of jurors' views, it cannot be said, in the abstract, that counsel's performance was deficient in conducting voir dire on prospective jurors' views on the death penalty. Yates fails to make any specific claims of ineffective assistance. Because it fails to specify a single instance of deficient performance, Rubsenstein's declaration does not provide prima facie evidence of deficient performance by counsel. Therefore, Yates necessarily fails to establish his ineffective assistance of counsel claim.

In sum, we dismiss claims 1, 10, and 17, relating to ineffective assistance of counsel. Yates shows only one instance of deficient performance but cannot establish prejudice arising from that instance.

G. Opportunity To Give Mitigating Evidence Meaningful Effect (Claims 18-21)

Yates raises four claims related to the statutory question posed to the jury during the penalty phase of trial. RCW 10.95.060(4) required the jury to consider the following question: "'Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?'" Yates claims that this question unconstitutionally requires a nexus between the crime and the mitigating circumstances. In addition, Yates claims that the prosecutor impaired his

constitutional rights by arguing that the jury should disregard mitigating evidence that lacked a nexus to the crime. Yates also claims that he was denied effective assistance of counsel when trial counsel failed to object to such arguments and when appellate counsel failed to assign error to this line of argument.

The Eighth and Fourteenth Amendments require, in a capital case, that the sentencing jury be "permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 264, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007). "Mitigating evidence" is broadly defined to include any evidence that "the sentencer could reasonably find . . . warrants a sentence less than death." *McKoy v. North Carolina*, 494 U.S. 433, 441, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990). This constitutional requirement may be violated by statutes, *Woodson*, 428 U.S. at 303-05; jury instructions, *Penry v. Lynaugh*, 492 U.S. 302, 328, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); or even prosecutorial argument, *Abdul-Kabir*, 550 U.S. at 259 n.21. The test to determine whether this constitutional requirement has been violated is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). Mitigating evidence is constitutionally relevant evidence. *See Abdul-Kabir*, 550 U.S. at 262-63;

*McKoy*, 494 U.S. at 441. As Yates correctly argues, requiring a nexus between the crime and the mitigating evidence is constitutionally prohibited. *Tennard v. Dretke*, 542 U.S. 274, 287, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004).

Yates's sentencing jury received three instructions relating to mitigating circumstances. Instruction 3 informed the jury of the burden and standard of proof, as well as the consequences of its determination:

> During this sentencing phase proceeding, the State has the burden of proving to you beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency. If the State meets this burden the death penalty will be imposed. The defendant does not have to prove the existence of any mitigating circumstances or the sufficiency of any mitigating circumstances.
>
> The defendant is presumed to merit leniency which would result in a sentence of life in prison without possibility of release or parole. This presumption continues throughout the entire proceeding unless you find during your deliberations that it has been overcome by the evidence beyond a reasonable doubt.

Clerk's Papers (CP) at 4444. Instruction 4 provided the jury with the question it was tasked with answering:

> The question you are required to answer is as follows:
>
> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?
>
> If you unanimously answer "yes", the sentence will be death. If you unanimously answer "no", or if you are unable to agree on a unanimous answer, the sentence will be life imprisonment without possibility of release or parole.

*Id.* at 4445. Finally, instruction 5 defined the term:

> A mitigating circumstance is a fact about either the offense or about the defendant which in fairness or in mercy may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense.

> The appropriateness of the exercise of mercy is itself a mitigating factor you may consider in determining whether the State has proved beyond a reasonable doubt that the death penalty is warranted.

> You are also to consider as mitigating circumstances any other factors concerning the offense or the defendant that you find to be relevant, including, but not limited to, the following:

> Whether there is a likelihood that the defendant will pose a danger to others in the future.

*Id.* at 4446.

### 1. Constitutionality of the Statutory Question

Yates first claims that the statutory question is unconstitutional because it requires a nexus between the mitigating evidence and the crime. Specifically, Yates argues that the introductory phrase—"'Having in mind the crime [of which the defendant has been found guilty]'"—"qualified and narrowed the jury's use of mitigating circumstances in reaching its penalty decision." Am. Pers. Restraint Pet. & Supporting Br. at 108. As a result, Yates contends that there was a reasonable likelihood "that the jury would conclude that it needed to find a nexus between any

'mitigating circumstances' and 'the crime' in order to give weight to those mitigating circumstances." *Id.* at 107-08.

To the contrary, the statutory question, fairly read, does not require a nexus between mitigating circumstances and the crime. The term "mitigating circumstance" is broadly defined to include "a fact about *either* the offense *or about the defendant* which in fairness or in mercy may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, *although it does not justify or excuse the offense.*" CP at 4446 (emphasis added). The statutory question directs the jury to determine whether the State has disproved the presence of sufficient mitigating circumstances to merit leniency. In making this determination, the jury is to "[h]av[e] in mind the crime of which the defendant has been found guilty." *Id.* at 4445. This is an appropriate consideration; the Supreme Court has made clear that the principle underlying the mitigation phase of a capital trial is that "punishment should be directly related to the personal culpability of the criminal defendant." *Penry*, 492 U.S. at 319. In order to consider an individual's culpability, the jury must necessarily have in mind some culpable act. Reading the instructions as a whole, there is no reasonable likelihood that the jury would have believed it could not consider mitigating evidence that lacked a nexus to the crime. Indeed, we upheld this same statutory question in *State v. Cross*, 156 Wn.2d 580, 604-05, 615, 132 P.3d 80 (2006).

51

Because the State is correct on the merits, it is unnecessary to consider its argument that this claim is barred by the invited error doctrine.

### 2. Prosecutorial Misstatement Claim

Yates next argues that even if the statutory question posed to the jury was constitutional, the prosecutor's closing argument prevented the jury from giving meaningful effect to Yates's mitigating evidence. The United States Supreme Court has explicitly identified prosecutorial arguments as a source of concern: "Prosecutors in some . . . cases" have taken "pains to convince jurors that the law compels them to disregard the force of evidence offered in mitigation." *Abdul-Kabir*, 550 U.S. at 261. At the same time, "prosecutorial misrepresentations . . . are not to be judged as having the same force as an instruction from the court." *Boyde*, 494 U.S. at 384-85. Moreover, in *Abdul-Kabir*, where the Court expressed particular concern about prosecutorial arguments, the language of the jury instruction, standing alone, appeared to preclude consideration of mitigating circumstances. 550 U.S. at 237-38.[10]

In the present case, the prosecutor incorrectly stated the law during a brief portion of rebuttal closing argument. The challenged argument is as follows:

---

[10] The jury in *Abdul-Kabir* was instructed to answer two special issues: (1) whether "the conduct of the defendant . . . that caused the death of the deceased . . . [was] committed deliberately and with the reasonable expectation that the death of the deceased or another would result" and (2) whether there was "a probability that the defendant . . . would commit criminal acts of violence that would constitute a continuing threat to society." 550 U.S. at 238.

52

Instruction No. 5 is extremely important because the definition of "mitigating circumstance" is not as broad as counsel would lead you to believe. It says that it is a fact about the crime, the offense, or a fact about the defendant which in fairness or in mercy extenuates or reduces the degree of moral culpability or justifies a sentence of less than death.

When you are thinking about what counsel has argued to you as mitigating evidence, you need to put it in this instruction. You need to see, *what is there about the fact that the defendant served in the military that in fairness or mercy somehow extenuates or reduces his moral culpability for the death of Melinda Mercer or the death of Connie Ellis.* What is it about that that justifies a sentence less than death for these murders? *How does the fact that he was a pilot relate logically to the defendant's moral culpability for killing these two women?*

77 VRP at 8290-91 (emphasis added). The problem with the prosecutor's argument is that mitigating evidence need not "relate logically" to the defendant's moral culpability. For example, a defendant's good behavior in prison is mitigating evidence even though it is not related to the defendant's moral culpability for the underlying crime. *Skipper v. South Carolina*, 476 U.S. 1, 4-5, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986) ("Although it is true that [inferences about the defendant's character and probable future conduct if sentenced to life in prison] would not relate specifically to [defendant]'s culpability for the crime he committed, there is no question but that such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" (citation omitted) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978))). Similarly, Yates's service in the military could be viewed by jurors as evidence of good character warranting a sentence less than death even though it is unrelated to the crimes he committed. The

53

prosecutor misstated the law in arguing that evidence that is not "related logically" to Yates's moral culpability for his crimes is not mitigating evidence.

Despite the misstatement, there is no reasonable likelihood that the jury was prevented from considering Yates's mitigating evidence. As in *Boyde*, "the context of the proceedings would have led reasonable jurors to believe that evidence of [Yates]'s background and character could be considered in mitigation." 494 U.S. at 383. The instruction expressly required consideration of mitigating evidence not associated with the crime itself, *see* CP at 4446 (directing jury to consider likelihood of future danger posed by defendant), and all of Yates's evidence at the penalty phase related to his background and character. Moreover, the instruction clearly defined mitigating circumstances as including facts "about the defendant which in fairness or in mercy may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense." CP at 4446. And the misrepresentation of mitigating circumstances was brief, and the prosecutor subsequently presented arguments rebutting the contention that the circumstances were sufficiently mitigating to warrant leniency. 77 VRP at 8291-8307. Indeed, the prosecutor returned to Yates's service as a pilot—the fact she had previously intimated was not logically related to his moral culpability, *see id.* at 8291—and made specific arguments about why, even considering it, the evidence did not merit leniency. *Id.* at 8302-03; *see id.* at 8220-21 (discussion of Yates's military

54

service in the initial portion of the State's closing argument). In light of the context in which the prosecutorial misrepresentation occurred, there is no reasonable likelihood that the jury was prevented from considering and giving effect to Yates's mitigating evidence.

### 3. Ineffective Assistance of Counsel

Yates finally argues that his trial counsel was ineffective for failing to object to the instruction and to the prosecutor's arguments relating to the issue of improperly requiring a nexus between mitigating circumstances and the crime. He also argues that his appellate counsel was ineffective in failing to challenge the prosecutor's arguments on appeal. These claims necessarily fail for a failure to show prejudice. *See Strickland*, 466 U.S. at 694. Because Yates cannot show that there was a "reasonable likelihood" that the jury applied the instruction in a way that prevented consideration of mitigating evidence, *Boyde*, 494 U.S. at 380, he cannot show that there was a reasonable probability that raising these issues would have affected the outcome of the trial, which means that he cannot show prejudice. *See Strickland*, 466 U.S. at 694.

We dismiss Yates's claims that either RCW 10.95.060(4) or the prosecutor's rebuttal closing argument prevented the jury from giving meaningful consideration to his mitigation evidence. We also dismiss the associated ineffective assistance of counsel claims.

H. Prosecutorial Misconduct Regarding Future Dangerousness (Claims 7-9)

Yates argues that the prosecution made improper comments during closing arguments about Yates's future dangerousness that were unsupported by the evidence. Yates also argues that he received ineffective assistance of counsel when trial counsel failed to object to these arguments and when appellate counsel failed to assign error to the misconduct. Because the prosecutors' arguments were based on reasonable inferences from the evidence, there was no misconduct. Accordingly, Yates's claims related to prosecutorial misconduct fail.

In order to demonstrate prosecutorial misconduct, one must show that "the prosecuting attorney's conduct was both improper and prejudicial." *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). In the context of closing arguments, misconduct includes making arguments that are unsupported by the admitted evidence. *See State v. Belgarde*, 110 Wn.2d 504, 505, 508-09, 755 P.2d 174 (1988). However, "the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" *Fisher*, 165 Wn.2d at 747 (quoting *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006)). The prosecutor's conduct is reviewed in its full context. *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011).

Yates identifies seven statements, each related to future dangerousness, made by the prosecution during closing argument that he identifies as misconduct. Five of

the challenged statements essentially argued that because Yates had committed murders in the past, he would be dangerous in the future:

> With this sort of track record, do you think he might be dangerous in the future?

77 VRP at 8215.

> How can you have any confidence that he is not just as dangerous now as he was in 1975, 1988, 1996, 1997 and 1998?

*Id.* at 8228.

> What is the best predictor of future behavior? The past. He murdered 15 people in cold blood and nearly a 16th. Now, one of the victims was a man, so it can't be said that only women would be in danger from Robert Yates. He is a proficient, smart, skillful murderer. He is healthy and strong and as resourceful as ever. And ladies and gentlemen, this man is exceedingly dangerous.

*Id.* at 8229.

> [W]e do know and your good common sense will so inform you that the best predictor of future behavior is past behavior.

*Id.* at 8293.

> [T]here is every reason to believe that a man who has a history of murder for three decades, in the '70s, the '80s and the '90s . . . is going to continue down that path.

*Id.* at 8294.

Yates also identifies two other statements as misconduct that relate to future dangerousness:

> [L]et us focus on whether he really would be safe in any event. Will he be isolated from others for the rest of his life? He obviously will not be

isolated from others for the rest of his life because what you are seeing on this chart is, across the top, the death penalty sentence versus life without parole.

. . . .

The testimony that you've heard, and I will just summarize it briefly that in every one of these categories, he gets an increasing amount of time out of his cell. He might have only one inmate per cell, by himself if he is in the intensive management unit, or he might have roommates. He's certainly going to be in contact with people if he is in general population as contrasted with the intensive management.

*Id.* at 8238.

Counsel has suggested that the defendant will do well in prison because when he is in a highly structured setting, like in the military, he doesn't seem to commit crimes. I think the evidence proves otherwise, ladies and gentlemen. The defendant was in the military in 1988 when he murdered Stacy Hahn. He was here on leave, but he was on active duty.

In addition to that, when the defendant came to Pierce county and murdered Melinda Mercer and Connie Lafontaine Ellis, he was coming here to serve his country. He was coming here for National Guard duty. That was the only reason he was in our jurisdiction. So when he was coming over here to partake in the structured activity that was supposedly so good for him and in which he performed so very, very well, he committed two aggravated murders.

The amount of structure in his environment is simply not a reliable predictor of the defendant's behavior.

*Id.* at 8294-95.

The prosecutors did not commit misconduct in this case because their arguments relating to future dangerousness were based on reasonable inferences from the facts adduced in both the guilt and penalty phases of trial. In *State v. Gentry*, 125

Wn.2d 570, 641-42, 888 P.2d 1105 (1995) (*Gentry* I), this court held that a prosecutor's argument that the defendant would pose a future danger was not misconduct because it was a reasonable inference from the fact that the defendant had been convicted of rape with a deadly weapon, manslaughter, and aggravated first degree murder. Yates acknowledged committing 15 murders. It follows that, as in *Gentry* I, the prosecutors' arguments of future dangerousness were reasonable inferences from Yates's criminal history.[11] Yates does not challenge the facts underlying those inferences (i.e., that Yates murdered 15 people, including one man; that the murders took place in 1975, 1988, 1996, 1997, and 1998; that Yates would have contact with other inmates; and that he committed the Pierce County murder while in Pierce County for National Guard duty). The expert declaration included with Yates's personal restraint petition to the effect that Yates would not be dangerous in prison would have been evidence —albeit cumulative evidence—for the jury suggesting a different inference but it would not render the prosecution's argued inference unreasonable. The jury was simply presented with multiple reasonable inferences.

---

[11] Yates does not contend that the arguments ran afoul of ER 404(b), nor could he. ER 404(b) prohibits admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." The State was not attempting to "show action" (i.e., demonstrate that something has occurred) but to suggest the possibility of future action. ER 404(b) would not apply.

Yates's citation to *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 3030 (2011), is unhelpful to his argument. In *Coble*, the Texas Court of Criminal Appeals held that a forensic psychiatrist's testimony about a capital defendant's future dangerousness was inadmissible because it lacked scientific reliability. *Id.* at 279-80. The psychiatrist's methodology relied heavily on past conduct to predict future conduct. *Id.* at 270-71. However, the *Coble* court *also* held that evidence of past violence was "[c]learly . . . sufficient" to support a finding of future dangerousness. *Id.* at 265-66. Thus, the *Coble* court necessarily held that the jury is entitled to make the reasonable inference that one whose conduct demonstrated dangerousness in the past remained dangerous in the future; its holding with respect to expert testimony employed a different standard.

Because the prosecution did not engage in misconduct, trial and appellate counsel did not provide deficient performance by failing to challenge the acts at issue in this claim. Additionally, because Yates's argument lacks merit, there is no need to consider the State's argument that these claims are merely reformulations of issues raised on direct review. We dismiss Yates's claim of prosecutorial misconduct based on arguments related to future dangerousness. We also dismiss the derivative claims of ineffective assistance of trial and appellate counsel.

I. Arbitrary Death Penalty (Claim 25)

Yates argues that Washington's death penalty is arbitrarily imposed in violation of the Eighth Amendment. Yates raised precisely the same claim on direct appeal, which we rejected. *Yates*, 161 Wn.2d at 792 ("Yates argues that Washington's death penalty statute is arbitrary and thus violates the Eighth Amendment prohibition against 'cruel and unusual punishments.'" (quoting U.S. CONST. amend. VIII)). Consequently, Yates is prohibited from relitigating this issue unless he can demonstrate that the interests of justice so require. *See Davis* I, 152 Wn.2d at 671. As discussed earlier, this is accomplished by showing either that there has been an intervening change in the law "'or some other justification for having failed to raise a crucial point or argument in the prior application.'" *Gentry* II, 137 Wn.2d at 388 (internal quotation marks omitted) (quoting *In re Pers. Restraint of Taylor*, 105 Wn.2d 683, 688, 717 P.2d 755 (1986)). Yates does not attempt to make this showing, despite the fact that the State, in its response, explicitly pointed to his failure to address the standard, *see* State's Corr. Resp. to Pers. Restraint Pet. at 198-99. Instead, Yates relies on intervening nonprecedential opinions to claim a change in the law. *See Baze*, 553 U.S. at 85 (Stevens, J., concurring); *State v. Davis*, 345 Or. 551, 593-94, 201 P.3d 185 (2008) (Walters, J., concurring).[12] All of the facts Yates relies on to

---

[12] Yates also cited a dissenting opinion, *Doss v. State*, No. 2007-CA-00429-SCT, 2008 WL 5174209 (Miss. 2008) (unpublished), but the opinions in that case were subsequently withdrawn. *Doss v. State*, 19 So. 3d 690, 693 (Miss. 2009).

support his collateral attack based on arbitrariness were available at the time of his direct appeal. Because Yates fails to show how the interests of justice require reconsideration of his argument that Washington's death penalty is arbitrary in contravention of the Eighth Amendment, we dismiss this claim.

J. Proportionality Review (Claims 23-24)

Yates challenges the manner in which this court employed proportionality review on direct appeal. Specifically, Yates raises two challenges: (1) he lacked notice of how this court conducts proportionality review, in violation of the due process clause of the Fourteenth Amendment; and (2) this court failed to adequately compare death sentences to "life" cases (i.e., those in which the defendant was eligible for the death penalty but instead received a life sentence). In support of the second challenge, Yates asserts that capital case reports remain deficient.

*1. Denial of Due Process*

Yates first argues that he lacked notice of the method by which this court conducts proportionality review and, therefore, was not accorded meaningful appellate review. Am. Pers. Restraint Pet. & Supporting Br. at 117; *cf. Parker v. Dugger*, 498 U.S. 308, 321, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally."). This argument lacks merit. We have identified four nonexclusive factors that will always be considered as

part of proportionality review: "(1) the nature of the crime, (2) the aggravating circumstances, (3) criminal history, and (4) personal history." *Cross*, 156 Wn.2d at 630-31. These factors were first articulated as a list in *Brown*, 132 Wn.2d at 555-56, long before Yates's direct appeal. Indeed, in *State v. Pirtle*, 127 Wn.2d 628, 683, 904 P.2d 245 (1995), this court rejected a due process challenge to its proportionality review that it perceived to be based on vagueness, noting that the court had "an explicit framework for analysis." Yates was not denied notice of the manner in which this court conducts proportionality review.

### 2. *Failure To Include "Life" Cases or Mitigating Facts*

Yates next claims that this court's "utterly perfunctory" proportionality review results in "the arbitrary or discriminatory imposition of death sentences in contravention of the Eighth Amendment." Am. Pers. Restraint Pet. & Supporting Br. at 140. Despite the broad language asserting facial unconstitutionality, this appears to be an as-applied challenge; the discussion of the defects is limited to defects that occurred in Yates's case. For similar reasons, Yates also argues he was deprived of a liberty interest, created by statute, without due process when the court failed to consider cases in which a death-eligible defendant received a sentence of life without the possibility of parole. The crux of Yates's argument with respect to both constitutional claims is that, for purposes of proportionality review, this court only compared Yates's case to other cases in which the death penalty had been applied

instead of also looking to cases resulting in a life sentence. Looking to life cases, Yates suggests that "it appears that a confession coupled with a willingness to plead guilty constitutes mitigation of the most persuasive kind," specifically pointing to Gary Ridgway's life sentence and Yates's life sentence for the 13 murders adjudicated by plea agreement in Spokane County. *Id.* at 116. Yates's argument lacks merit for two reasons: (1) he is incorrect that the court failed to consider cases involving life sentences, and (2) he relies on an incorrect interpretation of RCW 10.95.130(2)(b).

First, Yates is simply incorrect that we failed to consider death-eligible cases in which the death penalty was not imposed. In fact, we addressed two cases upon which Yates now relies: Gary Ridgway's King County case and Yates's Spokane County case. *Yates,* 161 Wn.2d at 793. We addressed Yates's proportionality argument regarding the two cases by noting that a prosecutor's exercise of discretion in a similar or more egregious case does not necessarily render a given death sentence disproportionate. *See id.*; *see also Cross,* 156 Wn.2d at 634 (discussing effect of Ridgway's plea deal). It was not that this court failed to consider death-eligible cases resulting in a life sentence; it was that consideration of those cases did not compel a finding of disproportionality.

Second, Yates misunderstands the concept of proportionality embodied in RCW 10.95.130(2)(b). Yates appears to believe that if some capital defendant has received life without parole, sentencing a similarly situated capital defendant to death

violates RCW 10.95.130(2)(b). But this court has repeatedly rejected the notion that proportionality requires mathematical precision or that the cases "'be matched up like so many points on a graph.'" *Elmore* II, 162 Wn.2d at 270 (quoting *State v. Lord*, 117 Wn.2d 829, 910, 822 P.2d 177 (1991)). Instead, proportionality review involves merely ensuring that the death penalty is "'not imposed *wantonly* and *freakishly.*'" *State v. Elmore*, 139 Wn.2d 250, 308, 985 P.2d 289 (1999) (*Elmore* I) (quoting *Brown*, 132 Wn.2d at 555); *see Cross*, 156 Wn.2d at 630. Thus, so long as the facts in a death penalty case "are similar to some of the facts in other cases in which the death penalty was upheld, the sentence is proportionate." *Elmore* II, 162 Wn.2d at 269 (summarizing holding in *Elmore* I, 139 Wn.2d at 308); *see, e.g., Cross*, 156 Wn.2d at 632-34; *State v. Elledge*, 144 Wn.2d 62, 80-83, 26 P.3d 271 (2001). Still, the pool of similar cases to which a given case is compared includes both those in which the death penalty is imposed and those in which it is not. *Elledge*, 144 Wn.2d at 79 n.5. That reflects this court's current interpretation of the proportionality requirement of RCW 10.95.130(2)(b). *See State v. Davis*, 175 Wn.2d 287, 347-48, 290 P.3d 43 (2012). This is the manner in which the court conducted proportionality review on direct appeal of Yates's capital sentence. *See Yates*, 161 Wn.2d at 788-94.

Yates has failed to show either a violation of the Eighth Amendment's prohibition of death sentences that are arbitrary or discriminatory or the deprivation of

a liberty interest (i.e., statutory proportionality review) without due process. Accordingly, his claims lack merit and is dismissed.

K. Cumulative Error (Claim 22)

Finally, Yates contends that he was denied his Fourteenth Amendment right to due process under the cumulative error doctrine. "The cumulative error doctrine applies where a combination of trial errors denies the accused a fair trial even where any one of the errors, taken individually, may not justify reversal." *In re Det. of Coe*, 175 Wn.2d 482, 515, 286 P.3d 29 (2012). Yates relies both on the errors alleged in his personal restraint petition and those found on direct appeal. The only partially meritorious claim Yates raises is that his trial counsel was deficient in failing to investigate whether the victims' family members would testify during the penalty phase of the trial. However, that deficient performance was not prejudicial. On direct appeal, we found no errors by the trial court. We did note, however, that the prosecutor had made two improper remarks, but that neither remark was prejudicial. *Yates*, 161 Wn.2d at 776, 780-81.

Yates fails to explain how the impact of the two improper remarks recognized on direct review, taken together with the impact flowing from trial counsel's failure to contact victims' family members about possible mitigation testimony was sufficient to deny him a constitutionally fair trial. Instead, Yates's arguments rely on the existence

of errors we have determined did not occur. Accordingly, Yates's cumulative error claim lacks merit and is dismissed.

## CONCLUSION

Yates has failed to establish any meritorious claims. We therefore dismiss Yates's personal restraint petition.

WE CONCUR:

_____
Owens, J.

_____
Fairhurst, J.

_____
Stephens, J.

_____

_____
Chambers, J.P.T.

No. 82101-1

MADSEN, C.J. (concurring)—I agree with the majority's dismissal of this personal restraint petition (PRP). Although I substantially agree with the majority, I write separately to state my concern with its treatment of the courtroom closure issue that the petitioner raises and the issue of sealing juror questionnaires.

At trial, Robert Yates failed to object to both the alleged closure and the sealing decision. On direct review, the failure to object would generally preclude review unless the claimed error was manifest error affecting a constitutional right. RAP 2.5(a)(3). The manifest error standard requires a showing of prejudicial effect. I do not believe Yates could meet this standard had he raised these issues on direct review. Even more significantly, however, is the fact that Mr. Yates is raising these issues in a PRP. Therefore, I believe he is bound to the standard articulated in *In re Personal Restraint of Haverty*, 101 Wn.2d 498, 504, 681 P.2d 835 (1984) (quoting *In re Lile*, 100 Wn.2d 224, 225, 668 P.2d 581 (1983)), which requires the petitioner alleging constitutional error to demonstrate "'actual and substantial prejudice'" as a result of the claimed constitutional error. Yates makes no attempt to meet this standard and, therefore, the majority correctly rejects these claims.

Madsen, C.J.

Gonzáles, J.

Majims, J.