IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 38496-9-III |
| | ) | |
| MARK AARON MOEN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Petitioner. | ) | |

SIDDOWAY, C.J. — In a timely personal restraint petition, Mark Moen presents expert testimony in support of a challenge to his child molestation-related convictions. He argues that his trial lawyer provided ineffective representation by failing to call an expert witness to testify to reasons the jury should conclude that his granddaughter's allegations against him were false memories.

Mr. Moen does not present evidence that the failure to call such an expert reflects a lack of diligence by his trial lawyer rather than a strategic choice. Without evidence of a lack of diligence by trial counsel, Mr. Moen needs to demonstrate that any competent attorney would have relied on expert testimony rather than cross-examination and argument to persuade jurors that a child's memories were induced rather than real. He fails to make this showing. We dismiss the petition.

FACTS AND PROCEDURAL BACKGROUND

In August 2016, Mark Moen, who had occasionally watched his three step-grandchildren at his and his wife's house, began to watch them at his stepdaughter's

home.  He would stay with them between the time they got home from school and the time his stepdaughter arrived home from work.  Mr. Moen's granddaughter M.A. was six going on seven at the time, and her twin brothers were three years older.

Due to a back injury that made standing uncomfortable, Mr. Moen often laid down on M.A.'s bed while babysitting the children.  M.A. typically played with her Barbie dolls in her bedroom where Mr. Moen laid down, while her brothers played video games in the living room located on the opposite end of the house.

On December 28, 2016, M.A.'s mother was talking to M.A. about how the family's new puppy liked M.A. more than other members of the family.  M.A. agreed, and told her mother the only room the puppy did not follow her into was her bedroom, when she and her grandfather were playing Barbies and the door was closed.  According to Mr. Moen, he had directed M.A. to close the door to the room because the puppy was not housebroken and had repeatedly defecated on her bedroom floor.

M.A.'s mother was troubled that Mr. Moen would play with his granddaughter behind a closed door.  She began asking M.A. pointed questions: first, whether the Barbie and Ken dolls would kiss (M.A. said yes); whether they would have sex (again, yes); then, whether grandfather had ever put his fingers inside M.A. (yes); and whether grandfather ever made M.A. do anything to him (initially no, although M.A. reportedly revealed something later).  Distressed by what she was hearing, M.A.'s mother called her biological father for advice; he encouraged her to take notes so she would have a record

2

to give to law enforcement. M.A.'s mother questioned M.A. further that day and on as many as three more days according to notes she later provided to law enforcement. The mother's notes reflect information from M.A. recorded by her on December 28 and 29, 2016, and January 1 and 4, 2017.[1]

On December 29, M.A.'s mother also contacted local law enforcement. The detective assigned to the case arranged for an advanced registered nurse practitioner (ARNP) to physically examine M.A. on January 4 and for a forensic interviewer to speak with M.A. on January 10. The physical examination revealed no abnormalities, but M.A. did volunteer to the ARNP that her grandfather had "put his finger in my private," and "put his private halfway in my butt." Report of Proceedings (RP) at 542.

The forensic interview was conducted by Tatiana Williams, who employed the Toms Lyons Ten-Step Interviewing Protocol (Lyons Method) in interviewing M.A. The Lyons Method is one of several nationally-recognized methods for forensically interviewing children. During the interview, M.A. told Ms. Williams that her grandfather was "doing bad stuff to me, like, um, putting his finger in my privates . . . and putting his privates in my other private." *State v. Moen*, No. 36738-0-III, slip op. at 3 (alteration in original) (Wash. Ct. App. July 16, 2020) (unpublished) (available at

_____

[1] At trial, the mother could not recall whether the notes dated after December 28 were the fruits of further questioning, spontaneous disclosures by M.A., or were her further recall of earlier questioning.

www.courts.wa.gov/opinions/pdf /367380_unp.pdf).  She told Ms. Williams that the

molestation was painful.  *Id.*  She said her grandfather also made her draw pictures with

"big breasts" in a purple and black notebook that M.A.'s mother later located in M.A.'s

bedroom.  *Id.*

Following the interview, the State charged Mr. Moen with two counts of first

degree child rape, two counts of first degree child molestation, and one count of unlawful

imprisonment with sexual motivation.

*Pretrial rulings on competency and child hearsay*

Shortly before trial, and nearly two years after Mr. Moen was charged, the trial

court conducted a hearing to determine whether then-nine-year-old M.A. was competent

to testify at trial, and whether to admit evidence of her statements to her mother, the

ARNP who conducted the physical exam, and Ms. Williams.

Mr. Moen's trial lawyer, Christian Phelps, stipulated to M.A.'s competency to

testify at trial but not the admissibility of M.A.'s hearsay statements.  He argued that the

reliability of M.A.'s statements was tainted by her mother's extensive leading

questioning.  He reminded the court that by her own admission, the mother's questioning

was longer in duration than the forensic interview.  He argued that M.A. would have been

confused by leading questions about sexual behavior with which a seven-year-old would

be unfamiliar.

While the court acknowledged that much of the mother's questioning was problematically leading, it concluded that the initial spontaneity of M.A.'s disclosure to her mother, the closeness in time of the disclosure to the alleged abuse, and M.A.'s willingness to deny some types of actions she was asked about weighed in favor of admitting the hearsay testimony.

*Trial*

At trial, the State presented testimony from M.A., her mother, her brothers, the detective assigned to the case and two other officers, the ARNP who performed the physical examination, and Ms. Williams. In the defense case, Mr. Moen called his son as a witness, who testified to having been frequently present when his father was babysitting M.A. at her home. Mr. Moen testified on his own behalf.

Mr. Phelps's trial theory was that M.A.'s mother's extensive questioning cast doubt on the reliability of all of M.A.'s statements thereafter. He established through questioning the officer who first responded to the mother's police report that the mother told him M.A. spontaneously disclosed the abuse, and the only question the mother asked her was "how long has this been happening." RP at 494. The officer testified he did not warn the mother not to engage in her own questioning of M.A. because he got the impression "that she knew better." RP at 495.

Mr. Phelps established in questioning Ms. Williams that a "primary, critical concern[ ]" in questioning a child about an event is to make sure the questions are open-

ended and not leading, including by using words the child has used, not introducing a word the child never said or a subject matter the child never talked about. RP at 609-10. He got Ms. Williams to concede that she should have followed up with M.A. when, in response to Ms. Williams asking M.A., "How do you feel about talking about all of this today?" M.A. answered, "Well I got to go over all of this with my mom, so not so bad." RP at 608-09. Ms. Williams said typically she would have wanted to get a sense of the child's prior conversation with the adult to determine whether it was leading, but she did not do so in this case. Mr. Phelps pointed out in closing argument that another significant statement by M.A. that Ms. Williams never followed up on was M.A.'s statement that she knew how to draw "girls like that," implying her drawings of breasts, "[b]ecause I learned it in a book that my mom has." RP at 780.

Mr. Phelps cross-examined the mother at length, and he argued to jurors in closing that "[e]very single act, every single topic was introduced to [M.A.] by her mom":

> This started with a conversation about the dog . . . and [M.A.] said [the dog follows me around] except when she's outside the door while I'm in my room with grandpa and the door's closed.
>     That sent [Mom] into the stratosphere. That was, in her mind, such a bizarre and egregious scenario, why in the world would . . . a grandpa be in a room with a granddaughter[?] And then every single question from there wasn't open-ended or what happened. It was specific, direct, and introducing sexual activity; every single question.
>     Did you make the Barbies kiss? Did you make the Barbies . . . have sex? Did he put his finger in your vagina? Did he put his penis in your vagina? Not one time was it, well, explain what happened. Everything was a direct, leading question by mom.

RP at 767-69.

The jury found Mr. Moen guilty of the two counts of first degree child molestation and one count of unlawful imprisonment with sexual motivation, but acquitted him of the even more serious charges of rape of a child in the first degree. The trial court imposed an indeterminate sentence of 114 months to life for the child molestation counts and a sentence of 41 months for the unlawful imprisonment count, to run concurrently.

*Direct appeal*

In a direct appeal, Mr. Moen contended he received ineffective assistance of counsel when Mr. Phelps failed to challenge M.A.'s competency to testify at trial and failed to object and move to strike what he argued was improper vouching by M.A.'s mother and Ms. Williams, and improper opinion testimony by Ms. Williams. A panel of this court rejected all of his challenges. *Moen*, slip op. at 1

The contention that Mr. Phelps was ineffective for failing to challenge M.A.'s competency to testify was rejected based on this court's conclusion from the record that "[h]ad he challenged M.A.'s competency, the trial court would have found her competent to testify." *Id.* at 8.

An argument was made that Mr. Phelps should have objected to "vouching" when M.A.'s mother testified that after M.A.'s disclosure, "'I told her I believed her and I—I let her know it was going to be okay.'" *Id.* at 9. This court expressed doubt that the

7

"reassurance to [a] nervous daughter qualifies as vouching, much less improper vouching," or that it was prejudicial. *Id.*

The argument was made that Mr. Phelps should have objected when Ms. Williams offered a lay opinion on how certain factors affect memory, a matter on which she *disclaimed* expertise. This court's response was that Mr. Moen could offer nothing more than speculation that the jury attached any significance to Ms. Williams's testimony, and "[i]t is just as likely the jurors reached their own independent opinions on these matters." *Id.* at 10.

Finally, Mr. Moen argued that Mr. Phelps provided ineffective assistance when he did not move to strike testimony from Ms. Williams that certain details provided by M.A. "'you wouldn't find coming from a child if it hadn't really been experienced.'" *Id.* at 10-11. Mr. Phelps objected to the testimony, and his objection was sustained. Later, outside the presence of the jury, Mr. Phelps asked the trial court to order the prosecutor not to draw attention to the testimony. Not only did the court do as requested (and the State complied), but the court instructed jurors that if it had ruled evidence inadmissible, they should not consider it. This court held that no prejudice was shown. *Id.* at 12.

Following the filing of this court's opinion, the mandate issued on October 14, 2020. Mr. Moen filed this personal restraint petition (PRP)—his first—within a year thereafter. Upon review of the PRP, the court called for a response from the State.

No. 38496-9-III
*In re Pers. Restraint of Moen*

Following receipt of the response, the PRP was referred to a panel for a determination without oral argument.

ANALYSIS

A petitioner is unlawfully restrained if his conviction was obtained or the sentence was imposed or entered in violation of the Constitution of the United States or the constitution or laws of the State of Washington. RAP 16.4(c)(2). To obtain relief from unlawful restraint, the petitioner must establish by a preponderance of the evidence actual and substantial prejudice resulting from alleged constitutional errors, or a fundamental defect that results in a complete miscarriage of justice for alleged nonconstitutional errors. *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 251, 172 P.3d 335 (2007); *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013). In the context of claimed constitutional errors, a petitioner must make the prima facie showing of actual and substantial prejudice before the court will proceed to considering the merits of the petition. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 810-11, 792 P.2d 506 (1990).

Mr. Moen's PRP identifies a single ground for relief:

Defense counsel's failure to retain and present evidence from a child forensic interview expert denied Mr. Moen effective assistance of counsel; as a result, substantial justice was not done.

PRP at 2 (some capitalization omitted).

Both the federal and state constitutions guarantee defendants effective assistance of counsel in criminal proceedings. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.

9

Washington has adopted the United States Supreme Court's *Strickland* test to determine whether counsel's representation was adequate. *See Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Cienfuegos*, 144 Wn.2d 222, 226-27, 25 P.3d 1011 (2001). Under *Strickland*, a defendant seeking to establish ineffective assistance of counsel must demonstrate that (1) counsel's representation was deficient and (2) counsel's deficient representation prejudiced the defendant. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). "To combat the biases of hindsight, our scrutiny of counsel's performance is highly deferential and we strongly presume reasonableness." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017).

A petitioner is prejudiced by ineffective assistance only if "there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *McFarland*, 127 Wn.2d at 334-35. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A personal restraint petitioner who establishes ineffective assistance of counsel has necessarily met their prima facie burden to show actual and substantial prejudice. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

Mr. Moen supports his PRP with the report of a panel of three experts who, after comparing the record of the questioning of M.A. by her mother with research literature on child suggestibility and false memory, reached opinions that M.A.'s statements were not credible or reliable. Mr. Moen argues that defense experts should have been retained to testify to these opinions at trial. Specifically, the experts express opinions that

> it appears that M.A.'s recollection of the alleged abuse reported during the forensic interview, the child hearsay hearing, and trial testimony was severely compromised and raising a serious doubt that her reports were the product of her own personal knowledge. We were left with the impression that M.A expressed very clearly that her memory was faulty, and that she was subjected to a highly suggestive series of interviews by her mother that most likely tainted her memory, especially given her young age (seven, at the time). . . . The evidence we reviewed suggests that M.A. failed to demonstrate an understanding of her obligation to speak the truth and her memory appeared to be so tainted by her interactions with her mother that it is highly doubtful she possessed a sufficient memory at the time of trial to retain an independent recollection of the alleged abuse.
>
> M.A.'s memory is undoubtedly faulty (by her own say-so), and the reason for this could very easily be the four days of her mother's anxious and suggestive interrogations, which included a number of abuse-explicit questions. M.A.'s mother made it clear that her children get "in trouble for lying," and she stated that she took notes while questioning M.A. Research has shown that note-taking during questioning can create aversive feelings in the person being questioned, and that most likely added to M.A.'s desire to give her mother the answers she perceived were "correct," in order to escape further interrogation and her mother's emotional intensity.
>
> In addition to the issue of M.A.'s memory, the people who questioned her in her forensic interview . . . did not adequately ensure that M.A. knew her obligation to tell the truth. In fact, M.A. specifically stated that she did not remember the rules about telling the truth. M.A.'s understanding of the truth versus a lie was never adequately established.

11

Br. in Support of PRP, App. B at 9-10 (Forensic Analysis Report) (footnote omitted).[2]

The decision whether to present expert testimony is generally a matter of trial tactics that does not support an ineffective assistance of counsel claim. *State v. Maurice*, 79 Wn. App. 544, 552, 903 P.2d 514 (1995). Criminal cases will arise where the only reasonable and available defense strategy requires the introduction of expert evidence, but "[r]are are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington v. Richter*, 562 U.S. 86, 106, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (quoting *Strickland*, 466 U.S. at 689). More commonly, there are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. And counsel is afforded the "strong presumption" of effective representation. *In re Pers. Restraint of Burlingame*, 3 Wn. App. 2d 600, 608, 416 P.3d 1269 (2018).

Mr. Moen has not provided evidence that Mr. Phelps did not consult with experts or consider calling an expert. When relying for an ineffective assistance of counsel claim

[2] For reasons that are not clear, the report from Mr. Moen's experts frames their assessment in terms of whether M.A. was competent to testify to the truth in forensic interviews and in court. As recounted above, M.A.'s competence to testify was stipulated to at trial, and the argument on direct appeal that the stipulation was ineffective assistance of counsel was rejected by this court.

The issue presented by Mr. Moen's PRP is not that M.A. was not competent. Although the experts discuss competence, what is important to the single issue Mr. Moen presents in his PRP is the opinions expressed by the experts in that context, which Mr. Moen argues would have been helpful expert testimony at trial.

on a trial lawyer's failure to investigate or consult experts, petitioners sometimes meet their evidentiary burden with sworn testimony of the trial lawyer, who admits a lack of diligence. Sometimes they present testimony from a third party who has personal knowledge of relevant action taken or not taken by the lawyer. *E.g.*, *Maurice*, 79 Wn. App. at 551 (accident reconstructionist engaged at trial had recommended that trial counsel retain a forensic mechanical expert and had personal knowledge it was not done). Instead, Mr. Moen argues that Mr. Phelps's actions could not be tactical "when there is no evidence that such expert was ever consulted or considered as a potential witness." Br. in Support of PRP at 45. The State argues that it was *Mr. Moen's burden* to present evidence on the issue, however, and lacking evidence, Mr. Moen's petition fails based on the strong presumption of competent representation alone. Response to PRP at 24.

The State is correct that speculation about Mr. Phelps's diligence cannot support Mr. Moen's argument that his representation was deficient. When a petitioner's attack is based on a matter outside the record, the petitioner bears the burden of introducing "competent, admissible evidence," which entitles him to relief. *Yates*, 177 Wn.2d at 18. In *In re Personal Restraint of Khan*, 184 Wn.2d 679, 693, 363 P.3d 577 (2015), a petitioner supported his claim of ineffective assistance of counsel with affidavits from several experts suggesting that counsel could have more effectively presented his theory of the case by offering expert testimony. But the Supreme Court rejected the challenge where the decision not to put on a defense expert was a reasonable trial strategy. It

13

pointed out that Khan's attorney could have reasonably decided that a clash of experts would not have helped his client's defense. *Id.* Moreover, Khan identified no prejudice that likely flowed from counsel's decision where his trial lawyer obtained important admissions through cross-examination and made good use of them in closing arguments. *Id.*

Without evidence establishing that Mr. Phelps's decision to rely on cross-examination and argument was not strategic, Mr. Moen fails to demonstrate deficient representation. Given Mr. Phelps's effective witness examination and argument, Mr. Moen fails to demonstrate prejudice. Ineffective assistance of counsel is not shown.

The petition is dismissed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_Siddoway, C.J._
Siddoway, C.J.

WE CONCUR:

_Fearing, J._
Fearing, J.

_Staab, J._
Staab, J.

14