IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38916-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSHUA Q. GERALD, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Joshua Q. Gerald was found guilty by a jury of second degree murder for the killing of Leroy Scott III. Prior to Mr. Gerald's trial, his codefendant, Raylin James, was found guilty of first degree murder for the killing of Mr. Scott. Mr. Gerald appeals arguing that his rights under the Sixth Amendment to the United States Constitution were violated because his jury did not represent a fair cross section of the community and because the court failed to take steps to ensure there was no racial discrimination affecting the composition of the jury. He also contends that there was insufficient evidence to convict him of second degree murder as an accomplice and that the prosecutor committed misconduct that was prejudicial.

We disagree with each of Mr. Gerald's arguments and affirm.

No. 38916-2-III
*State v. Gerald*

BACKGROUND

Mr. Gerald and Mr. James were charged with first degree murder for the killing of Mr. Scott. The two were tried separately. Mr. James was convicted of first degree murder and his judgment and sentence were affirmed on appeal.[1] Mr. Gerald and Mr. James are both Black, as was the victim, Mr. Scott.

PRETRIAL MOTIONS AND VOIR DIRE

Prior to trial, Mr. Gerald filed a motion to "Ensure Jury Diversity." Clerk's Papers (CP) at 292-98 (boldface and some capitalization omitted). In advance of the filing, Judge Scott Sparks opined that "[i]t is likely that there'll be no one of color on this jury. It's pretty—that's kind of the population of this county." Rep. of Proc. (RP) at 184. At the hearing on the motion, Judge Candace Hooper recalled that she could "think of several trials . . . where there were . . . [a]t least two" people of color on the jury. RP at 230.

Mr. Gerald's requested relief was to waive persons of color on the venire to the front of the venire or, possibly, to change venue to King County. The court stated it could not "grant a motion to ensure it. But I can grant a motion to—do our best to

---

[1] *State v. James*, No. 38782-8-III (June 1, 2023 Wash. Ct. App.) (unpublished), https://www.courts.wa .gov/opinions/pdf/387828_unp.pdf.

2

encourage it . . . [w]ithin the law." RP at 237. The court added it was "absolutely committed to not perpetuating any systemic—racism." RP at 242.

Defense counsel also explained that he had reached out to the county clerk and she "didn't seem to be familiar with anything on file with her that would—that would summarize the process of how jurors are called." RP at 243. The court responded that the court administrator would have that information and if she did not, the court would make sure that files regarding the jury selection process were properly stored with her. Ultimately, the court declined to rule on Mr. Gerald's motion to Ensure Jury Diversity until "such time as I need to." RP at 252. Defense counsel did not raise the issue again before trial.

During voir dire, after some jurors in the venire were released for hardship or cause, 53 jurors remained. Defense counsel asked if any of the jurors identified "as people of color" and only one juror, juror 56, raised her hand. RP at 446. Juror 56 stated that she identified as Hispanic. After the venire was excused for lunch, defense counsel renewed the motion to Ensure Jury Diversity. Given the makeup of the venire, defense counsel requested a mistrial, a change of venue to King County, or that juror 56 be moved to the front of the venire. The court considered the motion and declined to grant it. A jury was empaneled and the case proceeded to trial.

EVIDENCE PRESENTED AT TRIAL

Mr. Gerald, Mr. James, and Mr. Scott became friends while stationed together at Joint Base Lewis-McChord.  All three were in the military and lived on base.  However, according to Mr. Scott's ex-girlfriend Jazmyn Kelly, Mr. Gerald and Mr. James appeared to be better friends with each other while Mr. Scott seemed "separate" he "just kind of like tagged along with them."  RP at 1225.

Sometime in November or December 2019, marijuana was found in Mr. Scott's room.  Mr. Scott pointed to Mr. James and Mr. Gerald as the individuals who had put the marijuana in his room.  Mr. Gerald insisted to detectives that he did not feel "animosity toward[ Mr. Scott] about" Mr. Scott pointing the finger at them for the marijuana incident, but that Mr. James did.  RP at 1140.  Ms. Kelly testified that Mr. Scott was discharged from the military two weeks after the marijuana was found in his room.  Following his discharge, Mr. Scott struggled to get his car keys back from Mr. James and Mr. Gerald and, when he eventually did, he and Ms. Kelly discovered his car had been filled with "garbage bags worth of shredded paper."  RP at 1231.

A few months later, in April 2020, Mr. Scott made plans to celebrate his birthday in Ellensburg, Washington, at Hadassah Fisch's apartment.  Mr. Scott and Ms. Fisch were friends and their birthdays were one day apart.  Mr. Scott planned to have his birthday celebration at Ms. Fisch's apartment on Friday, April 24, the day of his birthday.  Mr.

4

Scott invited both Mr. Gerald and Mr. James to the party. Another friend of Mr. Scott's, Erica Key, testified that Mr. Scott expressed some anxiety about the party because he did not "want . . . anything bad to happen" like "any fighting or . . . disagreements." RP at 889.

Mr. Gerald and Mr. James arrived at Ms. Fisch's apartment on Friday evening for the party. Around 1:00 a.m., Mr. Gerald, Mr. James, and Mr. Scott all suddenly left Ms. Fisch's apartment. About an hour later, Mr. Gerald and Mr. James returned to Ms. Fisch's apartment "covered in dirt and blood" and without Mr. Scott. RP at 916. The next morning, Ms. Fisch observed blood on Mr. James's white car. Ms. Fisch wanted to search for Mr. Scott so she asked Mr. James if he was willing to "drive and look" for him. RP at 918. Before Mr. James would agree to search for Mr. Scott, he wanted to go to a car wash to clean his car. After cleaning his car, Mr. James, Ms. Fisch, and Ms. Fisch's roommate looked for Mr. Scott "in ditches" off of rural roads outside of Ellensburg but to no avail. RP at 920.

On Sunday, Mr. Gerald and Mr. James departed Ms. Fisch's apartment. Mr. James drove his own vehicle and Mr. Gerald drove Mr. Scott's vehicle. The two abandoned Mr. Scott's vehicle on the side of Interstate 90 near Thorp, Washington, and then continued their trek home together in Mr. James's vehicle.

5

On Sunday night, Mr. Gerald met up with his girlfriend, Tianna Brooks. Ms. Brooks observed that Mr. Gerald's right hand was injured and bruised. She testified that when she saw Mr. Gerald on Thursday night, the day before he traveled to Ellensburg for Mr. Scott's birthday party, his hand was uninjured. Detective Andrea Blume also observed "scabs on his knuckles and some bruising." RP at 1008.

On Sunday, April 26, 2020, Mr. Scott's badly beaten body was discovered in a drainage ditch off of Smithson Road and Highway 97 near Ellensburg. The investigation revealed that Mr. Gerald's and Mr. James's cellphones traveled to the site where Mr. Scott's body was found and remained there from 1:27 a.m. until 1:53 a.m. on the night the trio exited the birthday party. Mr. Scott's cellphone also traveled to the murder scene but it "never leaves" and was found near his body. RP at 1475. During an interview with Detective Blume, Mr. Gerald admitted to "being at the scene and seeing Scott killed." RP at 1175.

CLOSING ARGUMENT, DELIBERATIONS, AND VERDICT

During closing argument, the prosecutor quoted a Court of Appeals case to which defense counsel objected:

[PROSECUTOR]: . . . A person who is present at the scene and ready to assist—And these are my words, not [ ]his—even if no action takes place—is ready to assist, his or her presence is aiding in the commission of the crime.
    I went to the Court of Appeals, and I pulled this quote: An accomplice of first degree murder need only know that they are facilitating

6

a homicide. The accomplice need not have known the level—known the—need not have known that the principal, the other person, the person that they are being the accomplice of, had the kind of culpability required for any particular degree of murder.

[MR. GERALD'S COUNSEL]: I would object, your Honor. It's for you to instruct the [jury]. This is improper. It's not correct law. I move for a mistrial.

THE COURT: I'll sustain the objection but the jury will disregard—statements of law that are given by the prosecutor. The jury will—base their verdict on the evidence provided in the court and on the law that has been given to you by the court—which are in the instructions of the court.

I'm not granting—[a mistrial.]

RP at 1596-97.

Once closing arguments concluded, the jurors were excused to deliberate.

Thereafter, defense counsel acknowledged that:

I know that when motion for a mistrial isn't granted that defense counsel is bound to ask[ ] for a curative instruction. Your Honor read my mind, and I couldn't think of any better way to cure it. If I have a better idea now I think adding it would just compound the problem by drawing further attention to it.

RP at 1607.

During deliberations, the jury asked the court: "Regarding [jury instructions] #9/#16—is Raylin [James] considered to be Joshua's accomplice? Can Joshua be the defendant and be considered an accomplice at the same time? Is Joshua the defendant <u>and</u> the accomplice?" CP at 390. The court, prosecutor, and defense counsel discussed how to answer the question. The prosecutor opined that the jury was simply confused

7

about the terminology and that they may be conflating the words "'defendant' and

'principal.'" RP at 1614-15.  On the other hand, defense counsel felt that it was the

prosecutor's improper comments made during closing argument that confused the jury.

The court responded that the jury was "told to disregard that."  RP at 1616.  Ultimately,

the court advised the jury to "re-read your instructions."  RP at 1618.

The jury acquitted Mr. Gerald of first degree murder but found him guilty

of second degree murder.[2]

Mr. Gerald appeals.[3]

### ANALYSIS

Mr. Gerald appeals arguing that his rights under the Sixth Amendment to the

United States Constitution were violated because his jury did not represent a fair cross

section of the community and because the court failed to take steps to ensure there was no

racial discrimination affecting the composition of the jury.  Mr. Gerald further asserts that

---

[2] During the jury instruction conference among the court and counsel, defense counsel requested an instruction on the lesser included offense of second degree murder. The prosecutor and the court agreed that Mr. Gerald was entitled to the instruction and the jury was given two verdict forms, one for first degree murder and one for second degree murder.

[3] The State filed a cross appeal but it was rejected as the State was not seeking "'affirmative relief'" and their issue could be raised in their response brief.  Letter from Tristen Worthen, Clerk of Court Wash. Court of Appeals to Gregory Zempel, Kittitas County Prosecuting Attorney (May 25, 2022) at 1.  The State raises no issues in its response brief.

there was insufficient evidence to convict him of second degree murder as an accomplice and that the prosecutor committed misconduct.

WHETHER MR. GERALD WAS DEPRIVED OF AN IMPARTIAL JURY

Mr. Gerald argues that, in violation of the Sixth Amendment, he was deprived of a trial by an impartial jury because his jury did not represent a fair cross section of the community and because the trial court failed to take steps to ensure there was no racial discrimination affecting the composition of the jury. We disagree.

Constitutional issues are questions of law this court reviews de novo. *State v. Rivers*, 1 Wn.3d 834, 850, 533 P.3d 410 (2023). "A criminal defendant is entitled to a trial by an impartial jury, and this constitutional right includes the right to have jury panels drawn from a fair cross section of the community." *Id.* at 851. Mr. Gerald argues his fair cross section right was violated when Kittitas County's jury selection system produced a venire containing no Black jurors.

To prevail on a fair cross section claim under the Sixth Amendment, the *Duren* test requires a defendant prove: "(1) a distinctive group (2) is unreasonably underrepresented in his own venire and in jury venires generally, (3) as a result of systematic exclusion in the jury selection process." *Id.* (citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)).

9

Mr. Gerald meets the first element of the *Duren* test as Black people form a distinctive group.[4] *Rivers*, 1 Wn.3d at 863. However, Mr. Gerald cannot satisfy the second and third elements of the *Duren* test.

Mr. Gerald can show underrepresentation of Black people in his own venire (since there were none) but he produced no evidence, other than passing remarks from the court and census data, of an unreasonable underrepresentation of Black people and people of color in Kittitas County juries generally.

"'[M]ere 'underrepresentation,' in the sense that a group's representation is not at least equal to its proportion of the community, is not sufficient to show that the representation is not 'fair and reasonable.'"" *In re Pers. Restraint of Yates*, 177 Wn.2d 1,

---

[4] If Mr. Gerald's claim is that the "distinctive group" is people of color generally, he may not even be able to satisfy the first element of the *Duren* test. In *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 20, 296 P.3d 872 (2013), the Supreme Court held the defendant satisfied the first element of the *Duren* test when he identified African-Americans and Latinos as the "distinctive group." Similarly, the court in *Rivers* found the defendant "easily" met element one of the *Duren* test where the "distinctive group" was Black people. *Rivers*, 1 Wn.3d at 863. However, the term "person of color" is defined as "a person whose skin pigmentation is other than and especially darker than what is considered characteristic of people typically defined as white" or "a person who is of a race other than white or who is of mixed race." MERRIAM-WESTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/person%20of%20color (last visited Apr. 25, 2024). Who identifies as a person of color may, occasionally, be subjective, both to the observer, and to the individual. It is unlikely that "people of color" can form a "distinctive group" for purposes of the *Duren* test. It is hard to say exactly what "distinctive group" Mr. Gerald claims because he does not address the *Duren* test in his brief. *See* Br. of Appellant at 16 (Mr. Gerald's only reference to *Duren*).

20, 296 P.3d 872 (2013) (quoting *Duren*, 439 U.S. at 364). Moreover, Mr. Gerald is "not entitled to exact cross-representation in the jury pool, nor need the jury selected for his trial be of any particular composition." *State v. Hilliard*, 89 Wn.2d 430, 442, 573 P.2d 22 (1977).

Mr. Gerald posits in his brief that Kittitas County's census data suggests that the county is 83.7 percent white while the remaining 16.3 percent of people in Kittitas County are "people of color." CP at 293 n.2. He also points to the court's comment that "[i]t is likely there'll be no one of color on this jury. It's pretty—that's kind of the population of this county."[5] RP at 184. He contends that there is "no reason (or excuse) why juries in Kittitas County should always predictably be white." Br. of Appellant at 3-4, 20. Mr. Gerald's citation to census data and a passing remark from the court are not enough to show that Black people are generally underrepresented in juries in Kittitas County. Thus, he fails to meet element two of the *Duren* test.

---

[5] Contrast the comment made by Judge Sparks with this comment made by Judge Hooper at a different hearing:

> I suppose in the last 34 years full of jury trials that I've seen [in] this county, the number of trials where there are—three persons on jury panel who would be considered diverse would be fairly low. *Frequently one or two*, but three—because the county, the makeup of the county—is not as diverse as it could be. It really isn't.

RP at 229 (emphasis added).

11

Mr. Gerald also fails to satisfy element three. He points to a violation of

RCW 2.36.065, which states:

> It shall be the duty of the judges of the superior court to ensure continued random selection of the master jury list and jury panels, which shall be done without regard to whether a person's name originally appeared on the list of registered voters, or on the list of licensed drivers and identicard holders, or both. *The judges shall review the process from time to time and shall cause to be kept on file with the county clerk a description of the jury selection process.* Any person who desires may inspect this description in said office.

(Emphasis added.)

Mr. Gerald speculates that Kittitas County's jury selection process is

discriminatory. Mr. Gerald's only evidence of this is that there was allegedly no

description of the jury selection process on file when defense counsel attempted to review

it at the county clerk's office and that the judge appeared unfamiliar with the exact

process the county used for selecting juries. When the record is reviewed in its entirety

and in context, Mr. Gerald's claim that RCW 2.36.065 was not complied with fails.

First, when defense counsel expressed to the court that it could not find a

description of the jury selection process with the county clerk, the court advised that "the

court administrator probably has a description of how things work" and if they did not

"the presiding judge will—will direct her to make sure it gets there. Or myself in the

absence of the presiding judge." RP at 244-45. Defense counsel appeared satisfied with

the court's answer and never pursued the issue.

12

Mr. Gerald speculates, based on a passing comment from the court, that Kittitas County fails to adhere to the mandates of RCW 2.36.065. But even if the judges in Kittitas County fail to "review the process from time to time" as RCW 2.36.065 requires, Mr. Gerald does not explain how a violation of the statute amounts to prima facie evidence of systematic discrimination. Indeed, Mr. Gerald produced no evidence of systematic discrimination in Kittitas County's jury selection process and does not even attempt to show how he was prejudiced. "Where the selection process is in *substantial compliance* with the statutes, the defendant must show prejudice from the selection process; however, prejudice will be presumed if there is a material departure from the statutes."[6] *State v. Clark*, 167 Wn. App. 667, 674, 274 P.3d 1058 (2012) (emphasis added), *aff'd*, 178 Wn.2d 19, 308 P.3d 1058 (2013). In the absence of evidence that Kittitas County's jury selection process systematically excludes Black people, Mr. Gerald fails to meet element three of the *Duren* test.

Mr. Gerald also argues that the court's alleged failure to take steps to ensure no racial discrimination affected the jury composition was error. As a threshold issue, Mr. Gerald fails to provide evidence that there was discrimination affecting the jury pool. As

---

[6] Chapter 2.36 RCW is Washington's statutory scheme pertaining to juries and jury selection. RCW 2.36.054 mandates that juries in Washington be drawn from a master list comprised of all registered voters and holders of driver's licenses residing in the county. Mr. Gerald does not argue that this process was not complied with, he simply speculates that the judges in Kittitas County do not regularly review the process.

13

discussed above, there is no evidence that Kittitas County's jury selection process was discriminatory or that discrimination affected the jury in his case. Mr. Gerald simply argues that the trial court should have *ensured* there were Black people or people of color on his jury.

We review a trial court's ruling on challenges to the venire process for abuse of discretion. *State v. Tingdale*, 117 Wn.2d 595, 600, 817 P.2d 850 (1991). A trial court abuses its discretion when it exercises it on untenable grounds or for untenable reasons. *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013). When the jury selection process substantially complies with the jury selection statute, the defendant must show prejudice. *Tingdale*, 117 Wn.2d at 600.

Prior to trial, Mr. Gerald filed a motion to Ensure Jury Diversity requesting that the court take steps to ensure a racially diverse jury, including that the court only empanel a jury if there were at least three people of color seated on it. The court took Mr. Gerald's motion seriously and asked if "extra peremptory challenges" would assist in ensuring jury diversity. RP at 229. The court was otherwise unsure of how to implement Mr. Gerald's motion within the confines of the law. The court ultimately stated that it could not "grant a motion to ensure it. But I can grant a motion to—do our best to encourage it . . . [w]ithin the law." RP at 237.

14

During jury selection, Mr. Gerald renewed his motion to ensure jury diversity. Mr. Gerald requested a mistrial due to the makeup of the jury venire, a change of venue to King County, or, if those two requests were denied, that juror 56 be moved to the front of the panel to ensure she would be seated on the jury. The court administrator informed the court that 400 people had been summoned and only 69 jurors appeared.

The court ruled that a mistrial would not be appropriate simply because there were too few people on the jury panel who identified as persons of color. The court noted that the composition of the jury venire was not due to "bad faith" but that it was a "random selection of people and it was a random selection of people that showed up today." RP at 459. As to Mr. Gerald's request that juror 56, the Hispanic juror, be moved to the front of the venire, the court researched the issue and correctly concluded that it would destroy the statutory mandate of random selection if the court were to move juror 56 to the front of the panel. The court denied Mr. Gerald's motions.

The court did not abuse its discretion when it denied Mr. Gerald's motions. Mr. Gerald fails to show how Kittitas County substantially failed to comply with chapter 2.36 RCW and how he was prejudiced. Contrary to Mr. Gerald's assertion, the court was committed to diversity during jury selection and even granted Mr. Gerald's motion to play a video on implicit bias for the jury venire. Further, the jury acquitted Mr. Gerald of the more serious offense of first degree murder. The court's reasons for denying Mr.

Gerald's motions were tenable, based in law, and Mr. Gerald has failed to establish he was prejudiced.

Mr. Gerald's Sixth Amendment rights were not violated.

SUFFICIENCY OF THE EVIDENCE

Mr. Gerald argues there was insufficient evidence to convict him of second degree murder as an accomplice. We disagree.

The sufficiency of the evidence is a question of law this court reviews de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). When analyzing a sufficiency of the evidence claim, all reasonable inferences must be drawn in favor of the State. *Id.* "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

A person commits the crime of second degree murder when:

> (a) With intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person; or
> (b) He or she commits or attempts to commit any felony, including assault, other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime or in immediate flight therefrom,

16

he or she, or another participant, causes the death of a person other than one
of the participants . . . .

RCW 9A.32.050. Further, RCW 9A.08.020 (Washington's accomplice liability statute)

states in relevant part:

(3) A person is an accomplice of another person in the commission
of a crime if:
(a) With knowledge that it will promote or facilitate the commission
of the crime, he or she:
(i) Solicits, commands, encourages, or requests such other person to
commit it; or
(ii) Aids or agrees to aid such other person in planning or
committing it.

"[I]t is not necessary that jurors be unanimous as to the manner of an accomplice's

and a principal's participation as long as all agree that they did participate in the crime."

*State v. Hoffman*, 116 Wn.2d 51, 104, 804 P.2d 577 (1991). Accomplice liability is not

an element of, or alternative means of, committing a crime. *State v. Teal*, 152 Wn.2d

333, 338, 96 P.3d 974 (2004).

Mr. Gerald contends there was insufficient evidence to convict him of second

degree murder as an accomplice. However, it is unclear whether the jury found Mr.

Gerald guilty of second degree murder as a principal or an accomplice, and Mr. Gerald

does not challenge the sufficiency of the evidence to convict him as a principal. Because

there was sufficient evidence to convict Mr. Gerald as a principal, there was necessarily

sufficient evidence to convict him as an accomplice.

17

The to-convict instructions for second degree murder correctly stated:

> To convict the defendant of the crime of murder in the second degree each of the following elements of the crime must be proved beyond a reasonable doubt:

> One, that on or about April 24th, 2020 through April 25th, 2020 the defendant or an accomplice acted with intent to cause the death of . . . Leroy Joseph Scott;

> Two, that Leroy Joseph Scott died as a result of the defendant's or an accomplice's acts; and

> Three, that any of these acts occurred in the state of Washington.

RP at 1561.

Mr. Gerald argues that there was no evidence of Mr. Gerald's DNA on Mr. Scott and no evidence of Mr. Gerald's fingerprints or DNA on any murder weapon. Fatal to Mr. Gerald's argument, the State presented evidence that Mr. Gerald and Mr. James were both present where Mr. Scott's body was later found between 1:27 a.m. and 1:53 a.m. on the night of the murder. Ms. Fisch testified that after Mr. James and Mr. Gerald left her apartment with Mr. Scott, both men returned to her apartment muddy and bloody and without Mr. Scott. Mr. Gerald was also observed by Detective Blume and Mr. Gerald's girlfriend, Ms. Brooks, to have scabs and bruising on the knuckles of his right hand.[7] Ms. Brooks testified that the injuries to Mr. Gerald's hand were not present on the day before

---

[7] Mr. Gerald is right handed.

Mr. Scott's murder. Finally, Mr. Gerald admitted to being present at the scene when Mr. Scott was killed.

Based on the State's evidence, a rational trier of fact could have found beyond a reasonable doubt that Mr. Gerald intended to cause the death of Mr. Scott and did just that. The fact that Mr. Gerald's DNA was not found on Mr. Scott's body, or vice versa, is not dispositive. Because there was sufficient evidence to convict Mr. Gerald as a principal, there was sufficient evidence to convict him as an accomplice.

STATEMENT OF ADDITIONAL GROUNDS (SAG)

Mr. Gerald argues that the prosecutor committed misconduct during closing argument by "creat[ing] an environment susceptible to an extreme miscarriage of justice," and that the improper comments affected the jury's verdict. SAG at 1. We disagree that Mr. Gerald was prejudiced.

Prosecutorial misconduct is grounds for reversal if "'the prosecuting attorney's conduct was both improper and prejudicial.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (quoting *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009)). Mr. Gerald bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). A prosecutor's argument must be confined to the law stated in the trial court's instructions.

19

*State v. Walker*, 164 Wn. App. 724, 736, 265 P.3d 191 (2011). When the prosecutor

mischaracterizes the law, the prosecutor's actions are considered improper. *Id*.

"Once a defendant establishes that a prosecutor's statements are improper, we

determine whether the defendant was prejudiced." *Emery*, 174 Wn.2d at 760. "If the

defendant objected at trial, the defendant must show that the prosecutor's misconduct

resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *Id.*

The prosecutor made the following statements during closing:

> A person who is present at the scene and ready to assist—[a]nd these are
> my words, not his—even if no action takes place—is ready to assist, his or
> her presence is aiding in the commission of the crime.
>     I went to the Court of Appeals, and I pulled this quote: An
> accomplice of first degree murder need only know that they are facilitating
> a homicide. The accomplice need not have known the level—known
> the—need not have known that the principal, the other person, the person
> that they are being the accomplice of, had the kind of culpability required
> for any particular degree of murder.

RP at 1596-97.[8] Counsel for Mr. Gerald objected to these statements and moved for a

mistrial. The court denied the motion for a mistrial but provided a curative instruction to

the jury:

---

[8] The prosecutor's statement appears to have been pulled from *In re Pers. Restraint of Sarausad*, 109 Wn. App. 824, 836, 39 P.3d 308 (2001) ("[W]e conclude that the law of accomplice liability in Washington requires the State to prove that an accused who is charged as an accomplice with murder in the first degree, second degree or manslaughter knew generally that he was facilitating a homicide, but need not have known that the principal had the kind of culpability required for any particular degree of murder.").

THE COURT: I'll sustain the objection but the jury will disregard—statements of law that are given by the prosecutor. The jury will—base their verdict on the evidence provided in the court and on the law that has been given to you by the court—which are in the instructions of the court.

I'm not granting—[a mistrial.]

RP at 1597.

Later, the jury asked the court, "Regarding [jury instructions] #9/#16—is Raylin [James] considered to be Joshua's accomplice? Can Joshua be the defendant and be considered an accomplice at the same time? Is Joshua the defendant and the accomplice?" CP at 390. The court advised the jury to "re-read your instructions." RP at 1618.

Mr. Gerald points to the prosecutor's comment during closing and the jury's question during deliberations and argues that he was prejudiced by the prosecutor's improper statement. Though the prosecutor's comment was improper because it stated law outside of the court's instructions, the court provided a curative instruction to the jury and there is no evidence that the prosecutor's comment had a substantial likelihood of affecting the jury's verdict.

"Juries are presumed to follow instructions absent evidence to the contrary." *Dye*, 178 Wn.2d at 556. The jury's question during deliberations appeared unrelated to the prosecutor's improper comment and instead seemed to be a misunderstanding of the difference among the terms "defendant," "principal," and "accomplice." RP at 1614.

21

No. 38916-2-III
*State v. Gerald*

Indeed, whether Mr. Gerald can be the "defendant and be considered an accomplice at the same time" has nothing to do with whether Mr. Gerald knew he was facilitating a homicide. CP at 390; *see In re Personal Restraint of Sarausad*, 109 Wn. App. 824, 836, 39 P.3d 308 (2001).

There is no evidence that the prosecutor's improper comment during closing argument resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Pennell, J.

_____
Staab, A.C.J.

22